Filed: May 14, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-1335
(1:08-cv-00827-GBL-JFA)

SUHAIL NAJIM ABDULLAH AL SHIMARI; TAHA YASEEN ARRAQ RASHID; SA'AD HAMZA HANTOOSH AL-ZUBA'E; SALAH HASAN NUSAIF JASIM AL-EJAILI,

           Plaintiffs - Appellees,

      v.

CACI INTERNATIONAL, INCORPORATED; CACI PREMIER TECHNOLOGY, INCORPORATED,

           Defendants - Appellants.

--------------------

KELLOGG BROWN & ROOT SERVICES, INCORPORATED,

           Amicus Supporting Appellants,

PROFESSORS OF CIVIL PROCEDURE AND FEDERAL COURTS, Erwin Chemerinsky, Dean and Distinguished Professor of Law, University of California, Irvine School of Law, Eric M. Freedman, Maurice A. Deane Distinguished Professor of Constitutional Law, Hofstra University School of Law, Jennifer M. Green, Director, Human Rights Litigation and International Advocacy Clinic, University of Minnesota Law School, Jonathan Hafetz Associate Professor of Law, Seton Hall University School of Law, Alan B. Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law, George Washington University School of Law, Stephen I. Vladeck, Professor of Law and Associate Dean for Scholarship, American University Washington College of Law; RETIRED MILITARY OFFICERS; EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The

International Commission of Jurists, The Working Group Established by the Commission on Human Rights on the Use of Mercenaries as a Means of Violating Human Rights and Impeding the Exercise of the Right of Peoples to Self-Determination, Human Rights Watch, Ilias Bantekas, John Cerone, Geoffrey Corn, David Glazier, Kevin Jon Heller, Michael Newton, Marco Sassoli, Gary Solis, Scott M. Sullivan, Dr. Anicee Van Engeland,

Amici Supporting Appellees,

UNITED STATES OF AMERICA,

Amicus Curiae.

_____

No. 10-1891
(8:08-cv-01696-PJM)

_____

WISSAM ABDULLATEFF SA'EED AL-QURAISHI,

Plaintiff - Appellee,

v.

L-3 SERVICES, INCORPORATED,

Defendant – Appellant,

and

ADEL NAKHLA; CACI INTERNATIONAL, INCORPORATED; CACI PREMIER TECHNOLOGY, INCORPORATED,

Defendants.

-------------------

PROFESSORS OF CIVIL PROCEDURE AND FEDERAL COURTS, Erwin Chemerinsky, Dean and Distinguished Professor of Law, University of California, Irvine School of Law, Eric M. Freedman, Maurice A. Deane Distinguished Professor of Constitutional Law, Hofstra University School of Law, Jennifer M. Green, Director, Human Rights Litigation and

2

International Advocacy Clinic, University of Minnesota Law School, Jonathan Hafetz Associate Professor of Law, Seton Hall University School of Law, Alan B. Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law, George Washington University School of Law, Stephen I. Vladeck, Professor of Law and Associate Dean for Scholarship, American University Washington College of Law; RETIRED MILITARY OFFICERS; EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The International Commission of Jurists, The Working Group Established by the Commission on Human Rights on the Use of Mercenaries as a Means of Violating Human Rights and Impeding the Exercise of the Right of Peoples to Self-Determination, Human Rights Watch, Ilias Bantekas, John Cerone, Geoffrey Corn, David Glazier, Kevin Jon Heller, Michael Newton, Marco Sassoli, Gary Solis, Scott M. Sullivan, Dr. Anicee Van Engeland,

Amici Supporting Appellee,

UNITED STATES OF AMERICA,

Amicus Curiae.

_____

No. 10-1921
(8:08-cv-01696-PJM)
_____

WISSAM ABDULLATEFF SA'EED AL-QURAISHI,

Plaintiff - Appellee,

v.

ADEL NAKHLA,

Defendant – Appellant,

and

L-3 SERVICES, INCORPORATED; CACI INTERNATIONAL, INCORPORATED; CACI PREMIER TECHNOLOGY, INCORPORATED,

Defendants.

3

--------------------

PROFESSORS OF CIVIL PROCEDURE AND FEDERAL COURTS, Erwin Chemerinsky, Dean and Distinguished Professor of Law, University of California, Irvine School of Law, Eric M. Freedman, Maurice A. Deane Distinguished Professor of Constitutional Law, Hofstra University School of Law, Jennifer M. Green, Director, Human Rights Litigation and International Advocacy Clinic, University of Minnesota Law School, Jonathan Hafetz Associate Professor of Law, Seton Hall University School of Law, Alan B. Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law, George Washington University School of Law, Stephen I. Vladeck, Professor of Law and Associate Dean for Scholarship, American University Washington College of Law; RETIRED MILITARY OFFICERS; EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The International Commission of Jurists, The Working Group Established by the Commission on Human Rights on the Use of Mercenaries as a Means of Violating Human Rights and Impeding the Exercise of the Right of Peoples to Self-Determination, Human Rights Watch, Ilias Bantekas, John Cerone, Geoffrey Corn, David Glazier, Kevin Jon Heller, Michael Newton, Marco Sassoli, Gary Solis, Scott M. Sullivan, Dr. Anicee Van Engeland,

Amici Supporting Appellee,

UNITED STATES OF AMERICA,

Amicus Curiae.

O R D E R

The Court amends its opinion filed May 11, 2012, as follows:

On page 9, attorney information section, line 17, the names of "Raymond B. Biagini, Lawrence S. Ebner, MCKENNA LONG & ALDRIDGE LLP, Washington, D.C., for Kellogg Brown & Root Services, Incorporated, Amicus Supporting Appellants CACI

International, Incorporated, and CACI Premier Technology, Incorporated" are added.

For the Court – By Direction


/s/ Patricia S. Connor
Clerk

**ON REHEARING EN BANC**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SUHAIL NAJIM ABDULLAH AL
SHIMARI; TAHA YASEEN ARRAQ
RASHID; SA'AD HAMZA HANTOOSH
AL-ZUBA'E; SALAH HASAN NUSAIF
JASIM AL-EJAILI,

        *Plaintiffs-Appellees,*

        v.

CACI INTERNATIONAL,
INCORPORATED; CACI PREMIER
TECHNOLOGY, INCORPORATED,

        *Defendants-Appellants.*

No. 09-1335

KELLOGG BROWN & ROOT SERVICES,
INCORPORATED,

   *Amicus Supporting Appellants,*

PROFESSORS OF CIVIL
PROCEDURE AND FEDERAL COURTS,
Erwin Chemerinsky, Dean and
Distinguished Professor of Law,
University of California, Irvine
School of Law,

Eric M. Freedman, Maurice A. Deane Distinguished Professor of Constitutional Law, Hofstra University School of Law, Jennifer M. Green, Director, Human Rights Litigation and International Advocacy Clinic, University of Minnesota Law School, Jonathan Hafetz Associate Professor of Law, Seton Hall University School of Law, Alan B. Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law, George Washington University School of Law, Stephen I. Vladeck, Professor of Law and Associate Dean for Scholarship, American University Washington College of Law; RETIRED MILITARY OFFICERS; EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The International Commission of Jurists,

The Working Group Established
by the Commission on Human
Rights on the Use of Mercenaries
as a Means of Violating Human
Rights and Impeding the Exercise
of the Right of Peoples to Self-
Determination, Human Rights
Watch, Ilias Bantekas, John
Cerone, Geoffrey Corn, David
Glazier, Kevin Jon Heller, Michael
Newton, Marco Sassoli, Gary
Solis, Scott M. Sullivan, Dr.
Anicee Van Engeland,

*Amici Supporting Appellees,*

UNITED STATES OF AMERICA,

*Amicus Curiae.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:08-cv-00827-GBL-JFA)

WISSAM ABDULLATEFF SA'EED AL-
QURAISHI,

*Plaintiff-Appellee,*

L-3 SERVICES, INCORPORATED,

*Defendant-Appellant,*

and

No. 10-1891

ADEL NAKHLA; CACI
INTERNATIONAL, INCORPORATED;
CACI PREMIER TECHNOLOGY,
INCORPORATED,

*Defendants.*

PROFESSORS OF CIVIL
PROCEDURE AND FEDERAL COURTS,
Erwin Chemerinsky, Dean and
Distinguished Professor of Law,
University of California, Irvine
School of Law, Eric M. Freedman,
Maurice A. Deane Distinguished
Professor of Constitutional Law,
Hofstra University School of Law,
Jennifer M. Green, Director,
Human Rights Litigation and
International Advocacy Clinic,
University of Minnesota Law
School, Jonathan Hafetz Associate
Professor of Law, Seton Hall
University School of Law, Alan B.
Morrison, Lerner Family Associate
Dean for Public Interest and
Public Service Law, George
Washington University School of
Law, Stephen I. Vladeck,
Professor of Law and Associate
Dean for Scholarship, American
University Washington College of
Law; RETIRED MILITARY OFFICERS;

EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The International Commission of Jurists, The Working Group Established by the Commission on Human Rights on the Use of Mercenaries as a Means of Violating Human Rights and Impeding the Exercise of the Right of Peoples to Self-Determination, Human Rights Watch, Ilias Bantekas, John Cerone, Geoffrey Corn, David Glazier, Kevin Jon Heller, Michael Newton, Marco Sassoli, Gary Solis, Scott M. Sullivan, Dr. Anicee Van Engeland,

*Amici Supporting Appellee,*

UNITED STATES OF AMERICA,

*Amicus Curiae.*

WISSAM ABDULLATEFF SA'EED AL-
QURAISHI,

*Plaintiff-Appellee,*

v.

ADEL NAKHLA,

*Defendant-Appellant,*

and

L-3 SERVICES, INCORPORATED; CACI
INTERNATIONAL, INCORPORATED;
CACI PREMIER TECHNOLOGY,
INCORPORATED,

*Defendants.*

No. 10-1921

PROFESSORS OF CIVIL
PROCEDURE AND FEDERAL COURTS,
Erwin Chemerinsky, Dean and
Distinguished Professor of Law,
University of California, Irvine
School of Law, Eric M. Freedman,
Maurice A. Deane Distinguished
Professor of Constitutional Law,
Hofstra University School of Law,
Jennifer M. Green, Director,
Human Rights Litigation and
International Advocacy Clinic,

University of Minnesota Law School, Jonathan Hafetz Associate Professor of Law, Seton Hall University School of Law, Alan B. Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law, George Washington University School of Law, Stephen I. Vladeck, Professor of Law and Associate Dean for Scholarship, American University Washington College of Law; RETIRED MILITARY OFFICERS; EARTHRIGHTS INTERNATIONAL; INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS AND EXPERTS, Human Rights First, The Center for Victims of Torture, The International Commission of Jurists, The Working Group Established by the Commission on Human Rights on the Use of Mercenaries as a Means of Violating Human Rights and Impeding the Exercise of the Right of Peoples to Self-Determination, Human Rights Watch, Ilias Bantekas, John Cerone, Geoffrey Corn, David Glazier, Kevin Jon Heller, Michael Newton, Marco Sassoli, Gary Solis, Scott M. Sullivan, Dr. Anicee Van Engeland,

*Amici Supporting Appellee,*

UNITED STATES OF AMERICA,

                    *Amicus Curiae.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:08-cv-01696-PJM)

Argued: January 27, 2012

Decided: May 11, 2012

Before TRAXLER, Chief Judge, and WILKINSON,
NIEMEYER, MOTZ, KING, GREGORY, SHEDD,
DUNCAN, AGEE, DAVIS, KEENAN, WYNN, DIAZ, and
FLOYD, Circuit Judges.

---

Appeals dismissed by published opinion. Judge King wrote
the opinion, in which Chief Judge Traxler and Judges Motz,
Gregory, Duncan, Agee, Davis, Keenan, Wynn, Diaz, and
Floyd joined. Judge Duncan wrote a concurring opinion, in
which Judge Agee joined. Judge Wynn wrote a concurring
opinion. Judge Wilkinson wrote a dissenting opinion, in
which Judge Niemeyer and Judge Shedd joined. Judge Nie-
meyer wrote a dissenting opinion, in which Judge Wilkinson
and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** Joseph William Koegel, Jr., STEPTOE & JOHN-
SON, LLP, Washington, D.C.; Ari S. Zymelman, WILLIAMS
& CONNOLLY, LLP, Washington, D.C., for Appellants.

Baher Azmy, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; Susan L. Burke, BURKE PLLC, Washington, D.C., for Appellees. H. Thomas Byron, III, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** John F. O'Connor, STEPTOE & JOHNSON, LLP, Washington, D.C., for Appellants CACI International, Incorporated and CACI Premier Technology, Incorporated. Eric R. Delinsky, ZUCKERMAN SPAEDER LLP, Washington, D.C.; F. Whitten Peters, F. Greg Bowman, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellants L-3 Services, Incorporated and Adel Nakhla. Susan M. Sajadi, BURKE PLLC, Washington, D.C.; Katherine Gallagher, J. Wells Dixon, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; Joseph F. Rice, MOTLEY RICE LLC, Mt. Pleasant, South Carolina; Shereef Hadi Akeel, AKEEL & VALENTINE, PC, Troy, Michigan, for Appellees. Raymond B. Biagini, Lawrence S. Ebner, MCKENNA LONG & ALDRIDGE LLP, Washington, D.C., for Kellogg Brown & Root Services, Incorporated, Amicus Supporting Appellants CACI International, Incorporated, and CACI Premier Technology, Incorporated. Joshua S. Devore, Agnieszka M. Fryszman, Maureen E. McOwen, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Professors of Civil Procedure and Federal Courts, Amici Supporting Appellees. Jennifer B. Condon, SETON HALL UNIVERSITY SCHOOL OF LAW, Center for Social Justice, Newark, New Jersey; John J. Gibbons, Lawrence S. Lustberg, Jonathan M. Manes, GIBBONS P.C., Newark, New Jersey, for Retired Military Officers, Amici Supporting Appellees. Gabor Rona, Melina Milazzo, HUMAN RIGHTS FIRST, New York, New York; Robert P. LoBue, Ella Campi, Richard Kim, Elizabeth Shofner, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York, for International Human Rights Organizations and Experts, Amici Supporting Appellees. Marco Simons, Richard Herz, Marissa Vahlsing, Jonathan Kaufman, EARTHRIGHTS INTERNATIONAL, Washington, D.C., for Earthrights International, Amicus Supporting Appellees. Tony West, Assistant Attorney General, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

**OPINION**

KING, Circuit Judge:

Following the 2003 invasion of Iraq, the United States military took control of Abu Ghraib prison near Baghdad, using it to detain criminals, enemies of the provisional government, and other persons thought to possess information regarding the anti-Coalition insurgency. The United States contracted with CACI International, Incorporated (with CACI Premier Technology, Incorporated, together referred to herein as "CACI"), and Titan Corporation, now L-3 Services, Incorporated ("L-3"), to provide civilian employees to assist the military in communicating with and interrogating this latter group of detainees.

On June 30, 2008, a number of Iraqis who had been detained at Abu Ghraib and elsewhere filed lawsuits against CACI and L-3 in the Southern District of Ohio and the District of Maryland, alleging that the contractors and certain of their employees were liable in common law tort and under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for torturing and abusing them during their incarceration. Following the unopposed transfer of the Ohio action to the Eastern District of Virginia, where CACI is headquartered, Suhail Najim Abdullah Al Shimari and three co-plaintiffs submitted an Amended Complaint asserting that CACI, through its employees, agents, and government coconspirators, deprived them of basic human necessities, beat them and ran electric current through their bodies, subjected them to sexual abuse and humiliation, and traumatized them with mock executions and other sadistic acts. In the operative Second Amended Complaint filed in the companion litigation, seventy-two plaintiffs, headed by Wissam Abdullateff Sa'eed Al-Quraishi, detailed similar allegations against L-3 and Adel Nakhla, an L-3 employee residing in Maryland.[1]

---

[1]CACI and L-3 were each initially named as defendants in both lawsuits. Within a couple of months following commencement of the litiga-

## I.

### A.

On September 15, 2008, CACI moved to dismiss the Amended Complaint filed in the Eastern District of Virginia, maintaining generally that, among other things: (1) the dispute presented a nonjusticiable political question; (2) the inevitable application of the law of occupied Iraq rendered CACI, as part of the occupying power, immune from suit under *Coleman v. Tennessee*, 97 U.S. 509 (1878), and *Dow v. Johnson*, 100 U.S. 158 (1879); (3) the plaintiffs' claims were preempted by the "combatant activities" exception to the Federal Tort Claims Act (the "FTCA"), *see* 28 U.S.C. § 2680(j), discussed in *Ibrahim v. Titan Corp.*, 556 F. Supp. 2d 1 (D.D.C. 2007), and subsequently adopted on appeal, *see Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009) (citing *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988)); and (4) the company was entitled to absolute official immunity in accordance with *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir. 1996), because its employees had performed delegated governmental functions. With respect to the ATS claims, CACI proffered several additional arguments, none of them relevant here in light of the claims' eventual dismissal. *See infra* at 12.

L-3's motion to dismiss the Second Amended Complaint in the Maryland action, filed on November 26, 2008, and in which Nakhla joined, was predicated essentially along the same lines as CACI's, though it characterized *Mangold* as involving the application of derivative sovereign immunity instead of absolute official immunity. As CACI had previ-

tion, however, CACI was voluntarily dismissed from the Maryland action and the same was accomplished with respect to L-3 in the Virginia proceedings. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). On March 9, 2009, the district court in Maryland denied without prejudice L-3's motion to transfer venue of that case to the Eastern District of Virginia.

ously done, L-3 invoked the political question doctrine, cited the Supreme Court's decisions in *Coleman* and *Dow* (the "law-of-war defense"), and requested (through supplemental briefing) that the court adopt the combatant activities exception ultimately applied in *Saleh* ("*Saleh* preemption"). L-3 similarly advocated for dismissal of the ATS claims on substantially the same grounds identified by CACI.[2]

1.

On March 19, 2009, the district court in Virginia entered a Memorandum Order dismissing the ATS claims against CACI, but permitting the common-law tort claims to proceed. *See Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700 (E.D. Va. 2009). In so ruling, the court acknowledged its considerable reservations that the action implicated a political question, in that CACI, a private entity, was not the United States, and only low-level military and governmental personnel appeared to have been involved in the alleged mistreatment. *See id.* at 708-14. The court was similarly doubtful that the foreseeable application of Iraqi law required dismissal in light of CACI's apparent status as an arms-length contractor, "because even if the law of a foreign jurisdiction were to govern any of the Plaintiffs' claims, it would not regulate the conduct of the United States, a non-party to this suit between private parties." *Id.* at 725.

The dividing line between the bona fide military and its civilian support personnel also fueled the district court's uncertainty that the latter could have engaged in wartime activities as a "combatant" for purposes of adopting the D.C. Circuit's theory of FTCA preemption. *See Al Shimari*, 657 F.

---

[2]The Maryland district court denied L-3's dismissal motion as to the ATS claims. *See infra* at 15. L-3 maintains on appeal that this ruling was in error, but it confines its argument to the identical grounds urged in support of its primary contention that the court below incorrectly declined to dismiss the state-law tort claims.

Supp. 2d at 720-21. The court concluded that, in any event, the plaintiffs' allegations of torture at the hands of CACI failed to implicate the uniquely federal interests or irreconcilable conflict with state law that animated the Supreme Court's decision in *Boyle*, on which *Saleh* relied. *See id.* at 722-25.

Regarding CACI's claim of derivative immunity under *Mangold*, the district court set forth its view that the validity of such a claim depends on whether its proponent, in committing the act complained of, was "'exercising discretion while acting within the scope of their employment.'" *Al Shimari*, 657 F. Supp. 2d at 715 (emphasis omitted) (quoting *Mangold*, 77 F.3d at 1446). Citing "a very limited factual record," the court expressed its skepticism that CACI had established at the dismissal stage that its treatment of the plaintiffs at Abu Ghraib involved the exercise of discretion. *Id.* The court stated further that it was "completely bewildered" by the suggestion that it could accept CACI's representations that the company had performed within the scope of its agreement with the government "when the contract is not before the Court on this motion." *Id.* at 717. On March 23, 2009, CACI noted its appeal (No. 09-1335) from the district court's ruling.

2.

The assertion of *Mangold* immunity was viewed much the same way by the district court in Maryland, which, in its Opinion of July 29, 2010, concluded that, "relying on the information in the [Second Amended] Complaint, it is clearly too early to dismiss Defendants." *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 735 (D. Md. 2010).[3] The district court per-

(Text continued on page 15)

---

[3]In *Mangold*, we reversed the district court's denial of immunity to the defendant government contractor and its employees in a lawsuit brought by an Air Force officer and his wife for statements the contractor made to military officials investigating the officer's alleged misconduct. L-3 and CACI have each relied heavily on *Mangold* for the proposition that our decision in that case likewise entitles them to immunity for the tort claims

asserted by the plaintiffs here. The Maryland district court, noting the defendants' additional reliance on *Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000), characterized the immunity claimed as being in the nature of derivative sovereign immunity, which the court described as "protect[ing] agents of the sovereign from liability for carrying out the sovereign's will." *Al-Quraishi*, 728 F. Supp. 2d at 736. The court distinguished *Mangold*, opining that the immunity discussed therein "was based on a combination of derivative absolute official immunity and witness immunity, doctrines that differ from derivative sovereign immunity." *Al-Quraishi*, 728 F. Supp. 2d at 736.

The distinction drawn by the district court finds support in the text of *Mangold*, as expressed by our careful observation that the public policy justifying the grant of absolute immunity to federal officials exercising job-related discretion "provide[d] only a partial foundation for protecting" the defendant contractor in that case. *Mangold*, 77 F.3d at 1448 (citing *Westfall v. Ervin*, 484 U.S. 292, 300 (1988)). The remainder of that foundation was supplied by "the common law privilege to testify with absolute immunity in courts of law, before grand juries, and before government investigators." *Id.* at 1449. According to the Maryland district court, derivative absolute official immunity (invoked by CACI and more directly addressed by the Virginia district court in *Al Shimari*) "ensures that discretionary governmental decision makers are able to efficiently exercise their discretion in the best interests of the Government without 'the potentially debilitating distraction of defending private lawsuits.'" *Id.* (quoting *Mangold*, 77 F.3d at 1446). While *Mangold* immunity certainly has the effect of removing the potential distraction of litigation, it is important to note the narrow scope of the immunization actually authorized in that case, which we applied "only insofar as necessary to shield statements and information, whether truthful or not, given by a government contractor and its employees *in response to queries* by government investigators engaged in an official investigation." 77 F.3d at 1449. In light of our disposition of these appeals, *infra*, we express no opinion as to the merits of any immunity asserted by the defendants in general, or as to the pertinence of our *Mangold* precedent in particular, but instead leave those matters for the district courts to consider in the first instance should they arise on remand.

The difference between derivative sovereign immunity and derivative absolute official immunity (including any offshoots thereof) appears to be a fine one that may depend on the degree of discretion afforded the contractor by the government, which, at this stage of the litigation, is not a question capable of final resolution in either proceeding. Were that not the

ceived no such record deficiencies concerning L-3's and Nakhla's alternative bases for dismissal, however, deeming the facts as pleaded sufficient to reject outright both defendants' arguments. The court thus denied the motion to dismiss with respect to all claims, including those premised on the ATS. *See id.* at 724-33, 736-60. From the court's accompanying Order, L-3 noted its appeal (No. 10-1891) on August 4, 2010, followed two days later by another appeal (No. 10-1921) noted on behalf of Nakhla.

## B.

The appeals in *Al-Quraishi* were consolidated and argued in seriatim with the *Al Shimari* appeal before a panel of this Court on October 26, 2010. Apart from urging our affirmance on the merits, the plaintiffs in each matter alternatively maintained that we lacked appellate jurisdiction over the district courts' non-final orders denying the contractors' respective motions to dismiss. On September 21, 2011, we issued opinions in both cases, in which a majority of the panel concluded that jurisdiction was proper in this Court, and that the district courts had erred in permitting the claims against the contractors to proceed. *See Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413 (4th Cir. 2011); *Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d

---

case, the distinction could be crucial, in that fully developed rulings denying absolute official immunity are immediately appealable, while denials based on sovereign immunity (or derivative claims thereof) may not be. *See Hous. Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 279 (5th Cir. 2007) (denial of derivative sovereign immunity not appealable); *Alaska v. United States*, 64 F.3d 1352, 1356 (9th Cir. 1995) (denial of sovereign immunity not appealable); *Pullman Const. Indus., Inc. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994) (same). *But see In re World Trade Ctr. Disaster Site Litigation*, 521 F.3d 169, 191 (2d Cir. 2008) (disagreeing with foregoing authorities). Although the degree to which *Mangold* controls the specific assertions of immunity in these cases is yet to be decided, we will, for simplicity's sake, continue to refer to L-3 and CACI as having asserted "*Mangold* immunity."

201 (4th Cir. 2011).[4] Consistently therewith, we entered separate judgments reversing the orders on appeal and remanding with instructions to dismiss both proceedings.

On November 8, 2011, upon the timely petitions of the plaintiffs, *see* Fed. R. App. P. 35(b)-(c), we entered an Order granting en banc rehearing of all three appeals, thereby vacating our prior judgments. The appeals were thereafter consolidated for purposes of oral argument, which was conducted before the en banc Court on January 27, 2012.[5] Having fully considered the briefs and arguments of the parties, together with the written and oral submissions of the amici curiae permitted leave to participate, we conclude that we lack jurisdiction over these interlocutory appeals, and we therefore dismiss them.[6]

## II.

### A.

Except for the limited categories of interlocutory orders set forth at 28 U.S.C. § 1292, federal appellate jurisdiction is

---

[4]We released both of our panel opinions on September 21, 2011, following the Supreme Court's denial of certiorari in *Saleh* on June 27, 2011. We had previously, on March 11, 2011, placed these appeals in abeyance pending resolution of the *Saleh* certiorari petition.

[5]At our invitation, the Department of Justice, on behalf of the United States, submitted an amicus brief and participated in oral argument. Therein, the government took the position that we were without jurisdiction to decide these appeals. Just prior to argument, we granted the defendants leave to submit supplemental briefs in response to the government's amicus submission, after which the plaintiffs moved to tender their own supplemental briefs. We grant the plaintiffs' motions and accept their supplemental replies for consideration.

[6]The arguments and contentions before us in these appeals, though not identically presented or emphasized, are nonetheless substantially similar enough that we are content to continue the appeals' consolidation for purposes of decision. Hereinafter, we shall refer to L-3 and Nakhla together as "L-3," and both of them collectively with CACI as the "appellants."

reserved for "final decisions of the district courts of the United States." 28 U.S.C. § 1291. It is undisputed that the decisions underlying these putative appeals are interlocutory, at least in the procedural sense, in that no final order or judgment has been entered by either district court. It is also without contest that neither order has been certified appealable by the issuing court pursuant to 28 U.S.C. § 1292(b), and that none of that statute's provisions otherwise apply to confer jurisdiction on this Court.

Consequently, the only way we may be entitled to review the orders on appeal is if they are among "that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Expounding on the topic, the Supreme Court has emphasized that an appealable *Cohen* order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (alterations in original) (internal quotation marks omitted).

*Cohen* involved a stockholder's derivative action for mismanagement and fraud, in which the Supreme Court reviewed the district court's threshold decision declining to enforce a state law requiring plaintiffs in such cases to post security ensuring payment of attorney fees in the event the defendant corporation prevailed. Deeming the appeal properly taken, the Court declared no exception to the jurisdictional prerequisites of 28 U.S.C. § 1291, but instead described what would subsequently be coined the "collateral order doctrine," *MacAlister v. Guterma*, 263 F.2d 65, 67 (2d Cir. 1958), as a "practical, rather than a technical construction" of the statute. *Cohen*, 337 U.S. at 546.

The federal courts of appeals have consistently been charged with keeping a tight rein on the types of orders suitable for appeal consistent with *Cohen*. We are therefore bound to maintain "a healthy respect for the virtues of the final-judgment rule." *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009); *see also Will*, 546 U.S. at 350 ("[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope.").[7]

The Supreme Court's concern, as expressed through its repeated admonitions, is amply justified. The appellate courts are, by design, of limited jurisdiction; thus, accepting prejudgment appeals as a matter of course would "undermine[ ] efficient judicial administration and encroach[ ] upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Mohawk*, 130 S. Ct. at 605 (internal quotation marks omitted). In addition, routine interlocutory review would unacceptably subject meritorious lawsuits to "the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981) (internal quotation marks omitted).

Moreover, there is no need to construe *Cohen* broadly given the existence of a suitable alternative. The "safety valve" of discretionary interlocutory review under 28 U.S.C.

---

[7]This "modest scope" is apparent from the short list of orders approved by the Supreme Court for immediate review under *Cohen*. *See Osborn v. Haley*, 549 U.S. 225, 238-39 (2007) (denial of substitution of United States under Westfall Act); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-45 (1993) (denial to state of claimed Eleventh Amendment immunity); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) (denial of qualified immunity from suit pursuant to 42 U.S.C. § 1983); *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (denial to president of absolute immunity); *Helstoski v. Meanor*, 442 U.S. 500, 508 (1979) (denial of Speech and Debate Clause immunity); *Abney v. United States*, 431 U.S. 651, 660 (1977) (denial of double jeopardy bar).

§ 1292(b) is frequently a "better vehicle for vindicating [certain] serious . . . claims than the blunt, categorical instrument of [a] § 1291 collateral order appeal." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994). Accordingly, the collateral order doctrine should "never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Id.* at 868 (citation omitted).

## B.

Although a properly appealable collateral order under *Cohen* must of course satisfy all of the *Will* requirements, its hallmark is the encapsulation of a right whose abridgement is "effectively unreviewable" should appellate review await final judgment. *See Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 177 (5th Cir. 2009) (describing unreviewability as "the fundamental characteristic of the collateral order doctrine" (citation omitted)). The "critical question" in determining whether the right at issue is effectively unreviewable in the normal course "is whether the essence of the claimed right is a right not to stand trial" — that is, whether it constitutes an immunity from suit. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988) (internal quotation marks omitted). Absent an immediate appellate review of the denial of an immunity claim, the right not to stand trial "would be irretrievably lost." *Id.* (internal quotation marks omitted). By contrast, if the right at issue is one "not to be subject to a binding judgment of the court" — that is, a defense to liability — then the right can be vindicated just as readily on appeal from the final judgment, and the collateral order doctrine does not apply. *Id.* at 527.

In assessing whether the right sought to be protected constitutes a true immunity and not merely a defense, "§ 1291 requires [the court] of appeals to view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye." *Digital Equip.*, 511 U.S. at 873. As the Supreme Court has cautioned,

"[o]ne must be careful . . . not to play word games with the concept of a 'right not to be tried,'" *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989), as "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a right not to stand trial," *Digital Equip.*, 511 U.S. at 873. It is within the foregoing framework that we review de novo the appealability of the district courts' denial orders. *See Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985) (equating denials of qualified immunity to collateral denials of other asserted immunities or of double jeopardy invocations, and deeming de novo standard proper based on non-deferential review of latter claims).

## III.

In *Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007), the District of Columbia Circuit confronted an attempted appeal from the district court's interlocutory order refusing to dismiss an action brought by Indonesian villagers alleging serious injuries visited upon them by members of that nation's military in the defendants' private employ. According to the defendants, the dispute presented a nonjusticiable political question. The court of appeals declined to address the merits of the issue, noting the absence of "a single case in which a federal appeals court held that denial of a motion to dismiss on political question grounds is an immediately appealable collateral order." *Id.* at 352.[8]

---

[8]The D.C. Circuit was presented in *Doe* with the same argument the appellants make here: that the denial of a dismissal motion premised on the separation of powers doctrine is an appealable collateral order under *Cohen* because immediate review "is necessary to protect the executive branch from judicial intrusion into sensitive foreign policy matters" that could not be remedied on appeal from a final judgment. 473 F.3d at 351. The *Doe* court squarely rejected that mistaken notion, however, explaining that although the Supreme Court has "identif[ied] 'honoring the separation of powers' as a value that could support a party's interest in avoiding trial, [the Court has] only d[one] so while discussing cases involving immunity." *Id.*

That case yet appears to be lacking, and the appellants do not contend to the contrary. L-3, however, ventures that an appellate court may determine whether an action is a political question or otherwise nonjusticiable when it has proper jurisdiction over a different issue pursuant to *Cohen* or § 1292(b), if consideration of the former is "necessary to ensure meaningful review." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1991). We may also exercise so-called "pendent" appellate jurisdiction in circumstances where the question is "inextricably intertwined" with another that may be immediately reviewed. *Id.*; *see Rux v. Republic of Sudan*, 461 F.3d 461, 476 (4th Cir. 2006).

L-3's argument necessarily supposes the existence of an otherwise valid jurisdictional basis for its appeal. Absent an independently reviewable issue with which the political question doctrine may be inexorably bound, or one that cannot be reviewed in a meaningful fashion without addressing the justiciability of the underlying dispute, we are without authority to make any pronouncement on that aspect of the appellants' defense. We therefore withhold for the moment substantive comment on the political question doctrine, at least until we evaluate whether the law-of-war defense, *Saleh* preemption, or *Mangold* immunity provides the jurisdictional green light for us to proceed.

## A.

The appellants characterize their former presence in Iraq as "occupying forces" (L-3) or "occupying personnel" (CACI) that are answerable "only to their country's criminal laws," Opening Br. of CACI at 25, and thus "not subject to civil suits by the occupied," Opening Br. of L-3 at 22-23. In that regard, the appellants equate their situation with those of the Civil War soldiers in *Coleman v. Tennessee*, 97 U.S. 509 (1878), and *Dow v. Johnson*, 100 U.S. 158, 166 (1879), who sought relief from judgments entered against them for their wartime acts. The defendant in *Coleman* had been convicted and sen-

tenced to death by a Tennessee state court for murdering a civilian, though the same judgment and sentence had been previously imposed as the result of a United States Army court-martial. *Dow*, by contrast, involved a challenge to a civil judgment entered in Louisiana against a Union general after forces under his command had seized the plaintiff's private property in furtherance of the war effort.

Neither judgment was permitted to stand. In both cases, the Supreme Court considered the states of the Confederacy to have been "the enemy's country," to whose tribunals the "[o]fficers and soldiers of the armies of the Union were not subject." *Coleman*, 97 U.S. at 515. The Court expressed its bewilderment that a contrary result could obtain "from the very nature of war," concluding that "the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army. It is difficult to reason upon a proposition so manifest; its correctness is evident upon its bare announcement." *Dow*, 100 U.S. at 165.

Some differences between the disputes at bar and those underlying *Coleman* and *Dow* are readily evident. Most salient is that the civilian employees of CACI and L-3 assigned to Abu Ghraib were not soldiers. The idea that those employees should nonetheless be treated like full-fledged members of the military pervades this litigation, though the concept resonates with more force as to some of the appellants' other defenses, particularly *Saleh* preemption and *Mangold* immunity. *But cf. Ford v. Surget*, 97 U.S. 594, 601-02 (1878) (relieving Mississippi civilian from liability for burning landowner's cotton where destruction ordered by Confederate army in face of Union advance and those "commands would have been undoubtedly enforced by the same means of coercion as if he had been an enlisted soldier"). The potential liability of government contractors was front and center in both *Saleh* and *Mangold*, and if the legal principles in either case (or both) are deemed apposite to the dispute at bar, there

is little question that the appellants, as contractors themselves, may avail themselves of them.

Another distinction is that the appellants attempt to invoke the law-of-war defense exclusively on the assertion that their alleged wrongs will be evaluated under Iraqi law, and not the laws of Virginia, Maryland, or another state. If true, that may or may not be enough to bring *Coleman* and *Dow* into play, inasmuch as the overriding concern in those cases appears to have been less about the application of the criminal law of Tennessee or of Louisiana tort law (there being no suggestion that either differed significantly from the analogous law applied by the defendants' states of citizenry), and more about the jurisdiction of the "foreign" courts. *See Coleman*, 97 U.S. at 516 (musing that "there would be something incongruous and absurd in permitting an officer or soldier of an invading army to be tried by his enemy"); *Dow*, 100 U.S. at 163 (identifying "[t]he important question" for resolution as whether nation's military could be held liable "in the local tribunals"). Here, of course, the appellants are being sued on their home turf, in courts that are indisputably domestic.

Even assuming that the facts before us can be viewed in such a fashion to permit *Coleman* and *Dow* to apply, there is no indication from the opinions in those cases that the Supreme Court intended to construe the law-of-war defense as an immunity from suit, rather than merely an insulation from liability. *See Dow*, 100 U.S. at 165 (characterizing dispute as concerning personal jurisdiction); *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 500 (1989) ("[W]e have declined to hold the collateral order doctrine applicable where a district court has denied a claim . . . that the suit against the defendant is not properly before the . . . court because it lacks jurisdiction."). In its subsequent *Ford* opinion, with judgment having been entered against the defendant on a jury verdict, the Court in no way indicated that trial should not have been had.

Indeed, it seems a bit curious to imagine the nineteenth century Court regarding its decisions in the Civil War cases

as having durable precedential effect; the appeals afforded an unusual opportunity for substantive domestic review of what were, in effect, foreign pronouncements of judgment. But to the extent that *Coleman* and *Dow* possess continued relevance beyond their immediate context, it is nonetheless clear that the issues presented in those cases were effectively reviewed and disposed of on appeal, and, as such, the manner in which the Supreme Court chose to resolve them fails to compel the conclusion that immunity must be accorded all prospective defendants who insist they are similarly situated. The law-of-war defense thus provides no basis for an interlocutory appeal in this case.

B.

In a like fashion, *Saleh* preemption falls squarely on the side of being a defense to liability and not an immunity from suit. Immunity, according to the Supreme Court, derives from "an *explicit* statutory or constitutional guarantee that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989) (emphasis added).[9] There is no contention that the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), from which *Saleh* preemption is derived, relied on any such explicit guarantee embodied in

---

[9]The Supreme Court has properly dismissed the mistaken notion that *Midland Asphalt*'s "explicit . . . guarantee" requirement is in tension with the immediate appealability of an order denying qualified immunity, an inherently equivocal term that appears to connote only an implicit guarantee against the burdens of trial. Any tension can only be characterized as chimerical, however, in light of qualified immunity's "good pedigree in public law," which more than makes up for its implicitness. *Digital Equip.*, 511 U.S. at 875. The argument that an immunity need not be explicit in order for jurisdiction to lie under the collateral order doctrine "only leaves [the proponent of jurisdiction] with the unenviable task of explaining why other rights that might fairly be said to include an (implicit) 'right not to stand trial' aspect are less in need of protection by immediate review, or more readily vindicated on appeal from final judgment, than" the right the proponent asserts is an implicit right to be free from suit. *Id.* at 875-76.

statute or in the Constitution. *Boyle* preemption (and, thus, *Saleh* preemption) is, *ipso facto*, not immunity.

We are not the first court to arrive at this ineluctable conclusion. In *Martin v. Halliburton*, 618 F.3d 476, 487 (5th Cir. 2010), the Fifth Circuit similarly reckoned that "the combatant activities exception is not subject to a *sui generis* exemption from the ordinary jurisdictional requirements for denials of preemption claims."[10] Indeed, the *Boyle* Court itself repeatedly framed the preemption it recognized as creating a mere defense to liability. *See, e.g.*, 487 U.S. at 507 ("The imposition of liability on Government contractors [in the military procurement context] will directly affect the terms of Government contracts."); *id.* at 511-12 ("The financial burden of judgments against the contractors would ultimately be passed through . . . to the United States itself."); *id.* at 512 ("[S]tate law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced.").

It is tempting, we suppose, to blur the line between an eventual frustration of liability and the more immediate right to avoid suit altogether. One might be persuaded to consider the words "preemption" and "immunity" as mere labels that are more or less synonymous with each other, or to presume that the former can effectively operate as the latter. But

---

[10]*See also Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259 (9th Cir. 2010), in which the court addressed its jurisdiction over an interlocutory appeal premised on the discretionary functions exception to the FTCA. According to the *Rodriguez* court, because the right recognized by *Boyle* was merely a "defense to judgment" — and not, like qualified immunity, a "right not to be required to go to trial" — nothing is irretrievably lost by the lack of an immediate appeal from an adverse pretrial ruling. *Rodriguez*, 627 F.3d at 1266. The Ninth Circuit emphasized that *Boyle* did not devise a new species of immunity, but merely recognized that "'whether the facts establish the conditions for the [government contractor] defense is a question for the jury.'" *Id.* at 1265 (quoting *Boyle*, 487 U.S. at 514).

merely repackaging for the sake of convenience the preemption defense derived from *Boyle* as "combatant activities immunity," as our good colleague Judge Niemeyer does in speaking for the dissenters, *post* at 97, is patently incorrect.

Though *Boyle* preemption, like sovereign immunity, may be invoked to bar state law claims, the encapsulated rights serve distinct purposes. State law claims are preempted under *Boyle* simply because the imposition of liability in such situations is irreconcilable with uniquely federal interests. The right conferred through federal preemption, in other words, is the right not to be bound by a judgment stemming from state law duties.

In stark contrast, immunity has consistently been administered as a protection against the burden of litigation altogether. *See Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985). Further, as the court of appeals explained in *Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259, 1265 (9th Cir. 2010), "[a]lthough the source of the government contractor defense [recognized in *Boyle*] is the United States' sovereign immunity," the preemption defense is not itself a species thereof. To the contrary, entitlement to preemption "is only a corollary financial benefit flowing from *the government's* sovereign immunity." *Id.* Accordingly, *Boyle*'s "government contractor defense does not confer sovereign immunity on contractors," and as such, the denial of the defense is not immediately appealable. *Id.* (internal quotation marks omitted).

Importantly, the law requires that we assess the appealability of a potentially qualifying collateral order in a categorical sense, and not on a case-by-case basis.[11] Conducting that

---

[11]Whether to recognize an order as collateral is not "an individualized jurisdictional inquiry," but rather is based "on the entire category to which a claim belongs." *Mohawk*, 130 S. Ct. at 605. Consequently, "we do not now in each individual case engage in ad hoc balancing to decide issues of appealability." *Johnson v. Jones*, 515 U.S. 304, 315 (1995). It follows

assessment here leads to the conclusion that the denial of a preemption claim stemming from the combatant activities exception would not necessarily entail significant scrutiny of sensitive military issues. Fundamentally, there is little intrusion because the court's inquiry focuses on whether the contractor complied with the government's specifications and instructions, and not the wisdom or correctness thereof. The *Boyle* and *Saleh* decisions themselves well illustrate the lack of intrusion that would result from deferring review until after entry of a final judgment. *Boyle*, for example, involved an appeal from a jury verdict for the plaintiff, while "the two appeals in *Saleh* reached the D.C. Circuit using the normal machinery of §§ 1291 and 1292(b)." *Martin*, 618 F.3d at 488.[12]

Moreover, the district court in *Saleh* had conducted extensive discovery "regarding the military's supervision of the

that "the issue of appealability under § 1291 is to be determined . . . without regard to the chance that the litigation at hand might be speeded, or a particular justice averted, by a prompt appellate court decision." *Digital Equip.*, 511 U.S. at 868. Although the presence of a "substantial public interest," or "some particular value of a high order," is a necessary prerequisite to a collateral order appeal, *Will*, 546 U.S. at 352-53, the identification of such a public interest is not the end of the inquiry. As the Supreme Court explained in *Mohawk*, "[t]he crucial question . . . is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." 130 S. Ct. at 606.

[12]It is of no moment that the plaintiffs have alleged a conspiracy among the contractors, their employees, and certain military personnel. The conspiracy allegation does not transform this civil action into a challenge to the government's policy or interests, or into an attempt to hold its contractors liable for acting in accord with governmental decisions. Just as in *Saleh*, where some of the plaintiffs alleged a similar conspiracy, "there is no allegation, and no evidence, that" the "low-level soldiers" alleged to be acting in conspiracy with contractor personnel "had any control, de jure or de facto, over the" contractor personnel. 580 F.3d at 20 (Garland, J., dissenting). As such, these proceedings — like *Saleh* — constitute direct challenges only to "the unlawful and unauthorized actions of private contractors," *id.*, based on the pleadings and record to date.

contract employees as well as the degree to which such employees were integrated into the military chain of command," 580 F.3d at 4, with no ill effects. The Fifth Circuit, while acknowledging that *Boyle* preemption is underpinned by "a respect for the interests of the Government in military matters," has nonetheless reasoned that those interests can be safeguarded without resort to interlocutory review. *Martin*, 618 F.3d at 488. For example, a district court "should take care to develop and resolve such defenses at an early stage while avoiding, to the extent possible, any interference with military prerogatives." *Id.* Additionally, a trial court should consider "limiting discovery initially to such defenses" and "certifying orders denying [the] defense[ ] where the law is unsettled but, after refinement on appeal, might warrant dismissing plaintiffs' claims." *Id.*[13]

When properly conducted, suits against private contractors pose minimal risk that military personnel will be improperly haled into court or their depositions taken, because "[w]here discovery would hamper the military's mission, district courts can and must delay it." *Saleh*, 580 F.3d at 29 (Garland, J., dissenting) (citing, inter alia, *Watts v. SEC*, 482 F.3d 501, 508-09 (D.C. Cir. 2007)). Other procedural and substantive rules, such as Rule 45 of the Federal Rules of Civil Procedure and the state secrets doctrine, also adequately safeguard military interests. *See id.* at 29 n.18 (Garland, J., dissenting). Accordingly, we decline to recognize denials of *Saleh* preemption as a new class of collateral order.[14] Insofar as it would be

---

[13]The government's amicus submission agrees, observing that concerns over postponing review "can and should be addressed by careful limitation and close supervision of any necessary discovery by the district courts, and by the use of existing mechanisms for interlocutory appellate review, including certification under 28 U.S.C. § 1292(b)." Br. for the United States as Amicus Curiae at 4.

[14]And, indeed, it remains to be seen whether we will adopt the substantive concept of "battlefield preemption" espoused by the *Saleh* majority. For the purposes of our decision today, however, we assume but do not decide that such a defense may be available to the appellants.

founded on the false premise that immediate appeals are necessary in preemption cases to protect the government's legitimate military interests, such recognition would reflect an impermissibly indulgent view of appellate jurisdiction.

## C.

Before jurisdiction can be invoked under the collateral order doctrine, a district court must issue a "fully consummated decision" that constitutes "a complete, formal, and . . . final" resolution of the issue. *Abney v. United States*, 431 U.S. 651, 659 (1977). In other words, the court's ruling must be "the final word on the subject addressed." *Digital Equip.*, 511 U.S. at 867. If a ruling lacks finality, the threshold requirement for collateral order review — that the question in dispute be definitively resolved — is likewise left wanting. *See Will v. Hallock*, 546 U.S. 345, 349 (2006) (confining review of non-final orders to disputed questions conclusively determined, which raise important non-merits issues that are effectively unreviewable if not immediately appealed).

A question in dispute cannot be said to have been conclusively resolved if a district court "ma[kes] clear that its decision [is] a tentative one, . . . and that it might well change its mind" after further proceedings. *Jamison v. Wiley*, 14 F.3d 222, 230 (4th Cir. 1994). Disputed questions that arise with respect to claims of immunity are not the exception to that ironclad rule. Fundamentally, a court is entitled to have before it a proper record, sufficiently developed through discovery proceedings, to accurately assess any claim, including one of immunity. And even a party whose assertion of immunity ultimately proves worthy must submit to the burdens of litigation until a court becomes sufficiently informed to rule.

Manifestly, with respect to the appellants' attempts to invoke *Mangold* immunity in their respective actions, sufficient information was lacking. The Maryland and Virginia district courts each perceived that the validity of such invoca-

tions depended in significant part on whether the contractor involved was acting within the scope of its agreement with the United States. One could hardly begin to answer that question without resort to any and all contracts between the appellants and the government pertinent to the claims, defenses, and related matters below. *See, e.g.*, *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 741 n.11 (D. Md. 2010) (reasoning that contract could show, for example, that "'federal wartime policymaking' was not behind Defendants' alleged actions," in which case plaintiffs' "state law claims [would] not intrude upon the preempted field"). While other evidence and testimony could also be relevant to ascertain the appellants' business relationship with the government in general, and the parties' agreed duties and responsibilities in Iraq and at Abu Ghraib in particular, the analysis must necessarily begin with the written contract or contracts. *Cf. Harris v. Kellogg Brown & Root Servs., Inc.*, 618 F.3d 398, 402 (3d Cir. 2010) (rejecting appellate jurisdiction for failure of *Will*'s "conclusively determined" requirement, where only limited discovery had been conducted on combatant activities and political question defenses).[15]

In dissent, Judge Niemeyer contends that *Behrens v. Pelletier*, 516 U.S. 299 (1996), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), each a qualified immunity proceeding, provide for collateral order jurisdiction of the district courts' orders denying *Mangold* immunity, as illustrated by other of our qualified immunity cases. *See post* at 88-89, 90-91 (citing *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998); *Jenkins v. Medford*, 119

---

[15]As the Virginia district court pointed out, the contracts "will shed much light on the responsibilities, limitations and expectations that [the appellants] were bound to honor as government contractors. In addition, consideration of [their] course of dealing with the government may reveal whether deviations from the contract occurred and, if so, whether they were tolerated or ratified." *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 717 (E.D. Va. 2009). Of course, the district court can receive this evidence under seal, or otherwise, if the circumstances so warrant.

F.3d 1156 (4th Cir. 1997) (en banc); *Winfield v. Bass*, 106 F.3d 525 (4th Cir. 1997) (en banc)). According to Judge Niemeyer, *Behrens* and *Iqbal* counsel that Rule 12 denials of immunity invariably constitute final decisions appealable under § 1291, and those authorities "clearly establish that these appeals fit comfortably with the *Cohen* collateral order doctrine." *Post* at 80-81.

It is more accurate to say that orders denying dismissal motions, insofar as those motions are based on immunities that are not absolute but conditioned on context, such as qualified immunity in a § 1983 action or the derivative immunities at issue here, are, in accordance with *Behrens* and *Iqbal*, sometimes immediately appealable. *Winfield* makes the point:

> [W]e possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them.

106 F.3d at 530. More generally, we would have jurisdiction over an appeal like the ones attempted here "if it challenge[d] the materiality of factual issues." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 490 (5th Cir. 2001). By contrast, we lack jurisdiction if such an appeal "challenges the district court's genuineness ruling — that genuine issues exist concerning material facts." *Id.* Of course, "[w]e always have jurisdiction to determine whether the facts relevant to our jurisdiction exist." *Wireko v. Reno*, 211 F.3d 833, 835 (4th Cir. 2000) (citation omitted).

In *Iqbal*, the Supreme Court framed the genuineness-materiality distinction as one between "fact-based" or "abstract" issues of law, with only the latter supplying a proper foundation for immediate appeal. 556 U.S. at 674 (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)). The *Iqbal* Court

concluded that whether a particular constitutional right was clearly established for qualified immunity purposes presents an abstract issue of law that permits an appeal at the dismissal stage. *See id.* at 674-75. Here, as in *Iqbal*, there is no "vast pretrial record" to encumber our decisionmaking, *id.* at 674, but the issues before us are more factually entrenched and far less amenable to meaningful analysis by resort merely to the plaintiffs' pleadings. Thus, unlike *Iqbal*, these appeals encompass fact-based issues of law, with the need for additional development of the record being among those "matters more within a district court's ken." *Id.*

Hence, insofar as an interlocutory appeal of a denial of immunity requires resolution of a purely legal question (such as whether an alleged constitutional violation was of clearly established law), or an ostensibly fact-bound issue that may be resolved as a matter of law (such as whether facts that are undisputed or viewed in a particular light are material to the immunity calculus), we may consider and rule upon it. *See Behrens*, 516 U.S. at 313 (deeming appellate jurisdiction to have been properly asserted over denial of summary judgment in § 1983 action where adverse ruling was premised on defendant's alleged conduct having violated clearly established law); *McVey*, 157 F.3d at 276 (approving jurisdiction over similar legal issue at dismissal stage, where appeal did not "raise factual questions concerning the defendants' involvement, which would not be appealable").[16]

*Behrens*, then, confers jurisdiction of these appeals only if the record at the dismissal stage can be construed to present a pure issue of law. We might discern such an issue if we

---

[16]*See also Jenkins*, 119 F.3d at 1159-60 (noting existence of appellate jurisdiction over denial of qualified immunity on motion to dismiss, based in part on defendant's assertion that alleged violation did not implicate clearly established constitutional right); *Winfield*, 106 F.3d at 530 (recognizing jurisdiction over appeal of denial of qualified immunity insofar as district court ruled on summary judgment that asserted legal right was clearly established).

were of the opinion, as the dissenters evidently are, that persons similarly situated to the appellants are inevitably and invariably immune from suit premised on any and all conduct occurring (1) when they are in a war zone, by virtue of (2) a contract with the government. But not even *Saleh*, which receives a ringing endorsement in both dissents, went that far.

The court in *Saleh* adopted the following rule: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." 580 F. 3d at 9. The D.C. Circuit therefore conditions preemption on the presence of a certain level of public/private integration, the conduct of activities that may be classified as combat, and the military's retained prerogative concerning the decisionmaking process. Though the *Saleh* court had the luxury of a complete record developed through discovery to assist it in pondering those issues, there has been no discovery in the cases at bar, and the pleadings provide nothing approaching definitive answers.[17]

---

[17]Judge Wilkinson, on behalf of our dissenting friends, assumes as fact that the contractors were "integrated into wartime combatant activities under control of the U.S. military," *post* at 41, notwithstanding that there is no record evidence to support that assumption, or even what "integration" means in the context of war. Judge Wilkinson appears to equate integration with the plaintiffs' assertion of a conspiracy. *See post* at 41-42 (citing conspiracy allegations of Amended Complaint in *Al Shimari* in support of notion "that the contractors here were acting in collaboration with U.S. military personnel"); *see also supra* note 12. But there is simply no reason to believe that the integration of separate entities into a more or less unified whole is necessarily the legal equivalent of a collaboration or conspiracy between those entities.

It is also far from clear that, with respect to the torture and abuses alleged by the plaintiffs, the appellants were "acting under U.S. military authority," *post* at 47, as presumed by Judge Wilkinson. If one felt constrained to form a conclusion on the authorization question based on the available record, then one would be better served to reference the pertinent

Indeed, the questions that will require proper answers in order to gauge the appellants' entitlement to immunity have yet to be fully ascertained. In *Mangold v. Analytic Services, Inc.*, *supra* note 3, the relevant issues on appeal from summary judgment included whether government personnel were conducting an "official investigation," and whether the contractors' statements giving rise to potential liability were responsive to the investigators' queries, as opposed to being extraneous thereto. *See Mangold v. Analytic Services, Inc.*, 77 F.3d at 1449-50. Subsequently, in *Butters v. Vance International, Inc.*, *supra* note 3, also a summary judgment appeal, we were constrained to decide whether withholding a job promotion from the plaintiff was a "commercial activity," and whether that employment decision was made by the defendant or the foreign government with which it had contracted. *See Butters v. Vance International, Inc.*, 225 F.3d at 465-67. As with *Mangold* and *Butters*, this case too requires careful analysis of intrinsically fact-bound issues, which may resemble any or all of the *Saleh* considerations, and will almost certainly entail an exploration of the appellants' duties under their contracts with the government and whether they exceeded the legitimate scope thereof.

The appellants are requesting immunity in a context that has been heretofore unexplored. These are not disputes in which facts that might be material to the ultimate issue have been conclusively identified. Moreover, those facts that may have been tentatively designated as outcome-determinative are yet subject to genuine dispute, that is, a reasonable fact-finder could conclude in favor of either the plaintiffs or the

---

allegations of the plaintiffs that, for example, "CACI knew that the United States government has denounced the use of torture and other cruel, inhuman, or degrading treatment," *Al Shimari* Amended Complaint at ¶ 95; "L-3 permitted [its] translators to ignore — repeatedly — the military's instructions to abide by the Geneva Conventions," *Al-Quraishi* Second Amended Complaint at ¶ 430; and "L-3 affirmatively hid the misconduct of its employees from the United States military," *id.* at ¶ 433.

defendants. *See Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005). Because the courts' immunity rulings below turn on genuineness, we lack jurisdiction to consider them on an interlocutory appeal. *See Winfield*, 106 F.3d at 530; *Bazan*, 246 F.3d at 490.[18]

Thus, although *Mangold* immunity confers upon those within its aegis the right not to stand trial, the appellants have yet to establish their entitlement to it. *See Martin*, 618 F.3d at 483 (concluding that claims of immunity must be "substantial," and not "merely colorable"). Because these appeals were taken before the district courts could reasonably render a decision on the applicability of *Mangold* and, perhaps, *Butters*, there is no collateral order fulfilling the *Will* requirements for appealability pursuant to *Cohen*, and therefore no jurisdiction in this Court to review any related aspect of the proceedings below.[19]

---

[18]The Supreme Court's recent decision in *Filarsky v. Delia*, No. 10-1018, 2012 WL 1288731 (U.S. Apr. 17, 2012), is not at all to the contrary. The issue in *Filarsky*, an appeal by a private lawyer from the denial of qualified immunity in a § 1983 case, was "whether an individual hired by the government to do its work is prohibited from seeking such immunity." *Id.* at *3. The Supreme Court concluded in the negative, and, consistent therewith, we have not curtailed the opportunity of the appellants herein to seek immunity from the plaintiffs' claims; such immunity may yet be had. It is also worth noting that the appeal in *Filarsky* was taken only after the district court had ruled on summary judgment, *see id.* at *4, ascertaining that the issues in controversy were strictly legal, i.e., whether qualified immunity could be extended to private parties, and whether the alleged constitutional violation was one of clearly established law.

[19]The same lack of jurisdiction obtains with respect to L-3's attempted appeal of the Maryland district court's denial of its motion to dismiss the ATS claims, insofar as that appeal is grounded in any of the derivative immunities we have discussed. *See supra* note 2 (observing winnowing of L-3's ATS arguments from those presented to the district court). Similar unsettled questions pertaining to potentially relevant considerations such as agency, the scope of L-3's duties under the contracts, and the degree of integration may bear on whether the asserted immunities are properly "derived" to defeat the plaintiffs' claims. Further, we agree with the court

D.

There being no independent basis for appellate jurisdiction premised on the law-of-war defense, *Saleh* preemption, or *Mangold* immunity, we are without pendent jurisdiction to further consider the appellants' contentions that the plaintiffs' claims present nonjusticiable political questions. Our rejection of each of the three proffered bases also precludes the exercise of jurisdiction regardless of whether the appellants' political question defense is inextricably intertwined with any of them, or whether those bases are similarly interdependent with one another.

IV.

Pursuant to the foregoing, these consolidated appeals must be dismissed.

*APPEALS DISMISSED*

DUNCAN, Circuit Judge, concurring:

I respect the majority's well-reasoned opinion in this case and therefore fully concur in its conclusion that we lack jurisdiction to hear this appeal. I write separately only to express

below that although the Maryland plaintiffs have sued under the ATS, that litigation strategy should not be construed as a judicial admission that the actions of L-3 were those of the United States, thereby crystallizing access to a sovereign immunity defense and providing, through the denial of such immunity, an independent basis for appellate jurisdiction. *See Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 751-53 (D. Md. 2010). Our conclusion in that regard is buttressed by *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 & n.20 (2004), in which the Supreme Court carefully left open the question of whether ATS liability may be imposed on private actors. Obviously, if the plaintiffs' ATS claims may be maintained against L-3 as a private actor but not as an agent of the government acting within the scope of its agency, L-3's status is one more issue that may be appropriate for the district court to resolve following discovery.

my hope that the district courts in these consolidated appeals will give due consideration to the appellant's immunity and preemption arguments—especially in light of the Supreme Court's recent opinion in *Filarsky v. Delia*, 132 S. Ct. 1657 (2012), as discussed in Judge Niemeyer's dissent—which are far from lacking in force.

Judge Agee has authorized me to indicate that he joins in this concurrence.

WYNN, Circuit Judge, concurring:

I concur fully in the thoughtful and well-reasoned majority opinion in these cases. I write separately only to underscore the prudence of the majority's restraint, which promotes both "efficient judicial administration" and "the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009).

With respect to the latter consideration, I feel compelled to reiterate the majority's holding that our limited appellate role leaves us without jurisdiction at this stage of the litigation to consider the underlying merits of these appeals. Likewise, as noted in the majority opinion, "facts that might be material to the ultimate issue have [not yet] been conclusively identified" in these cases, which are on appeal from motions to dismiss. *Ante* at 34.

Accordingly, today's opinion offers no guidance to the district court on the underlying merits of these matters. To do otherwise would, in my opinion, potentially usurp the role of the district court or risk overstepping our own. *See United States v. Fruehauf*, 365 U.S. 146, 157 (1961) ("Such [advisory] opinions, such advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for

decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests, we have consistently refused to give."). Further, to the extent that my colleagues, in separate opinions, offer their views on the underlying merits of these cases, those opinions, "by their nature[,] express views that are not the law." *Arar v. Ashcroft*, 585 F.3d 559, 581 n.14 (2d Cir. 2009) (en banc).

WILKINSON, Circuit Judge, dissenting:

The majority in this case tries to present its view as some sort of innocuous jurisdictional disposition. But the jurisdictional ruling is wrong, and the decision is anything but innocuous. It inflicts significant damage on the separation of powers, allowing civil tort suits to invade theatres of armed conflict heretofore the province of those branches of government constitutionally charged with safeguarding the nation's most vital interests.

I fully join Judge Niemeyer's fine dissent. My good colleague has ably addressed many of the failings of today's decision, and I see no need to repeat those points here. I write separately only because the difficulties with these actions are so legion that no single dissent could hope to cover them all.

The majority and I disagree on much, but there is no disagreement about the Abu Ghraib photographs that have apparently inspired this litigation. *See ante* at 10. Americans of good will were sickened by those photographs and the depraved conduct that would be reprehensible whenever, wherever, and against whomever it was applied. But acknowledging that fact answers only the question of whether this is a hard case. It does not answer the question whether it is bad law whose lasting consequences and abiding damage will long outlive the distressing photographs that have prompted the suits herein.

The actions here are styled as traditional ones and wrapped in the venerable clothing of the common law. Even on common law terms, however, they are demonstrably incorrect, and the impact which tort doctrine will have on military operations and international relations magnifies the difficulties immeasurably. I dare say none of us have seen any litigation quite like this and we default if we accept uncritically or entertain indefinitely this novel a violation of the most basic and customary precepts of both common and constitutional law.

Sadly, the majority's opinion does precisely this. After reading its decision, one could be forgiven for thinking that the issue before us is a simple jurisdictional question arising out of ordinary tort suits. But these are not routine appeals that can be quickly dismissed through some rote application of the collateral order doctrine. This case instead requires us to decide whether the contractors who assist our military on the battlefield will be held accountable through tort or contract, and that seemingly sleepy question of common law remedies goes to the heart of our constitutional separation of powers. Tort suits place the oversight of military operations in an unelected judiciary, contract law in a politically accountable executive. And in the absence of some contrary expression on the part of the Article I legislative branch, the basic principles of Article II require that contractual, not tort, remedies apply.

The majority emphatically decides this weighty question by pretending not to decide, as its dismissal of these appeals gives individual district courts the green light to subject military operations to the most serious drawbacks of tort litigation. But arrogating power to the Third Branch in a contest over military authority is the wrong call under our Constitution, and there is no garb for this decision so benign as to obscure the import of what the majority has done.

We tread this territory at our peril. This decision is contrary to decades of Supreme Court admonitions warning federal

courts off interference with international relations. Of course military contractors should be held accountable, and it is important that a framework be set in place to accomplish this task. But instead of establishing that framework, the majority succumbs to mere drift and in so doing places courts in the most damaging and least defensible legal landscape possible. None of us have any idea where exactly all this is headed or whether the damage inflicted on military operations will be only marginal or truly severe. At a minimum, however, today's decision breaches a line that was respected by our predecessors on courts high and low. I would not cross this boundary even if the collateral order doctrine could cloak my steps. With all respect for my fine colleagues, I would remand these actions to the district court with direction that they be dismissed.

Part I of my dissenting opinion discusses the utter unsuitability of tort actions such as these in the context of an international theatre of war. Part II addresses why contract law is compatible with the separation of powers and the responsibilities allocated the executive branch under Article II of our Constitution. Part III explains why the majority's application of the collateral order doctrine goes beyond being incorrect to inflicting damage on American interests overseas.

I.

Tort regimes involve well-known tradeoffs. They may promote the public interest by compensating innocent victims, deterring wrongful conduct, and encouraging safety and accountability. However, tort law may also lead to excessive risk-averseness on the part of potential defendants. And caution that may be well-advised in a civilian context may not translate neatly to a military setting, where the calculus is different, and stakes run high. Risks considered unacceptable in civilian life are sometimes necessary on a battlefield. In order to secure high-value intelligence or maintain security, the military and its agents must often act quickly and on the basis of

imperfect knowledge. Requiring consideration of the costs and consequences of protracted tort litigation introduces a wholly novel element into military decisionmaking, one that has never before in our country's history been deployed so pervasively in a theatre of armed combat.

The majority acquiesces in judicial control over these sensitive military judgments. It opens the door for the plaintiffs to conduct broad discovery based on boilerplate complaints alleging a laundry list of state law claims, including "assault and battery," "sexual assault and battery," "intentional infliction of emotional distress," and "negligent hiring and supervision." By allowing such claims to go forward against contractors integrated into wartime combatant activities under control of the U.S. military, the majority raises thorny questions of whose law should apply, compromises the military's ability to utilize contractors in the future, and nudges foreign policy and war powers away from the political branches of the federal government and into the hands of federal courts. Simply put, these state tort claims have no passport that allows their travel in foreign battlefields, and we have no authority to issue one.

The complaint makes clear, and the contractors do not dispute, that the contractors here were acting in collaboration with U.S. military personnel. *See, e.g.*, Al Shimari Amended Complaint ¶¶ 1, 70, 71, 118, 124, 135. The majority nonetheless draws the odd distinction that contractors and the military may be in a "conspiracy" without somehow being "integrated." *See ante* at 33 n.17. In addition to the forementioned paragraphs, the complaint in fact provides ample allegations of integration. For example, the *Al-Quraishi* plaintiffs claim that "L-3 employed all the civilian translators used by the military in Iraq," Al-Quraishi Amended Complaint ¶ 78, and that "Defendants' acts took place during a period of armed conflict, in connection with hostilities" in which the U.S. military was engaged, *id.* ¶ 280. Indeed, they allege integration so complete that civilian interrogators were giving orders to mili-

tary personnel. *Id.* ¶ 221. For its contrary view, the majority departs from the well-established rule that we take the assertions of the complaint on a motion to dismiss as true. While the whole gravamen of the complaint is military-contractor cooperation and collaboration, the majority would have us believe they were more akin to strangers in the night.

The majority also suggests that the contractors may have departed from military instructions. *See ante* at 33-34 n.17. If the contractors did depart from the military's instructions, that would allow the government to pursue a breach of contract claim. *See infra* Part II. Ironically, the complaint itself speaks specifically in terms of a failure to "abide[ ] by the contract terms," Al-Quraishi Amended Complaint ¶ 247, even though the plaintiffs were in no sense a party to the same. But any breach of contract does not begin to confer a cause of action in tort on the part of detainees in a theatre of armed conflict. There is no indication that Congress or any other law-making authority, federal or state, wanted foreign nationals in detention to litigate in tort the relationship between military contractors and the U.S. military when the government itself as a party to the contract has posited no need to do so.

## A.

From this point, the problems with this litigation only multiply. First, due largely to their inventive nature, these suits present the difficult question of whose law should govern them. The majority clears the way for one federal court, sitting in Maryland, to apply Iraqi tort law to the alleged conduct —in an Iraqi war zone—of a Virginia-headquartered contractor integrated into wartime combatant activities of the U.S. military, and for another federal court, sitting in Virginia, to apply Virginia tort law to a similarly situated contractor for alleged conduct also occurring in an Iraqi war zone. This is, to put it mildly, no way to run a railroad.

1.

The court below in *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702 (D. Md. 2010)—applying the principle of *lex loci delicti*—decided that "Iraqi law applies to all of Plaintiffs' state law claims." *Id.* at 763.* This conclusion is highly troublesome. Most fundamentally, the application of Iraqi law against agents of the U.S. military constitutes a complete surrender of sovereignty. The majority allows Iraqi citizens who were imprisoned in an active theatre of war to bring tort suits against the occupying authority based on Iraqi causes of action. Such suits are not only novel, to say the least, but also in conflict with Supreme Court precedent. *See, e.g.*, *Dow v. Johnson*, 100 U.S. 158, 165, 170 (1879) (explaining that occupying forces are not subject to the laws of the occupied territory); *Coleman v. Tennessee*, 97 U.S. 509, 515, 517 (1878) (same).

The majority does not point to a single case in which foreign citizens were allowed to sue the occupying authority in its own courts under foreign causes of action. Likewise, it offers no support for its assertion that *Dow* and *Coleman* do not apply to military contractors, citing only *Ford v. Surget*, 97 U.S. 594 (1878), a case implying that law-of-war immunity is *not* limited to uniformed soldiers. *See Ford*, 97 U.S. at

---

*The *Al-Quraishi* district court also declined to dismiss plaintiffs' Alien Tort Statute claims because, in its judgment, "Plaintiffs' claims constitute recognized violations of the law of nations, appropriately assertable against Defendants." 728 F. Supp. 2d at 715. Such claims could be precluded by *Kiobel v. Royal Dutch Petroleum Co.* (No. 10-1491), in which the Supreme Court is expected to decide whether "the Alien Tort Statute . . . provide[s] subject matter jurisdiction over claims against corporations," *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *cert. granted*, 132 S. Ct. 472 (Oct. 17, 2011) (Mem), and "[w]hether and under what circumstances the Alien Tort Statute . . . allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States," ___ S. Ct. ___, 2012 WL 687061 (Mar. 5, 2012) (Mem).

606-08 (holding a civilian immune from civil suit for burning cotton in support of the Confederate military).

Moreover, the majority is simply wrong in suggesting that the *Dow* and *Coleman* Courts were concerned only with protecting the occupying authority from foreign tribunals, in contrast to foreign laws. *See, e.g., Dow,* 100 U.S. at 165 ("When, therefore, our armies marched into . . . the enemy's country, their officers and soldiers *were not subject to its laws,* nor amenable to its tribunals for their acts. They were subject only to their own government, and *only by its laws,* administered by its authority, could they be called to account." (emphases added)); *id.* at 170 ("The question here is, What is the law which governs an army invading an enemy's country? *It is not the civil law of the invaded country* . . . ." (emphasis added)); *Coleman,* 97 U.S. at 515 ("Officers and soldiers of the armies of the Union *were not subject during the war to the laws of the enemy,* or amenable to his tribunals for offences committed by them. They were answerable only to their own government, and *only by its laws,* as enforced by its armies, could they be punished." (emphases added)); *id.* at 517 (Following military occupation, "the municipal laws of [the occupied territory] . . . remain in full force *so far as the inhabitants of the country are concerned* . . . . This doctrine does not affect, in any respect, the exclusive character of the jurisdiction of the military tribunals over the officers and soldiers of the army of the United States . . . ; for, as already said, *they were not subject to the laws* nor amenable to the tribunals of the hostile country." (emphases added)).

The application of Iraqi tort law to U.S. military contractors creates practical problems as well. American courts are ill-suited to decide unsettled questions of Iraqi law. The district court in *Al-Quraishi,* for instance, considered "Whether Aiding and Abetting and Conspiracy are Recognized Torts Under Iraqi Law and Whether Iraqi Law Allows Punitive Damages." 728 F. Supp. 2d at 764. The defendants argued that aiding and abetting and conspiracy are not cognizable causes of action

under Iraqi tort law, and that punitive damages are not allowed as a remedy. *Id.* The plaintiffs disagreed, and the parties "submitted affidavits from Iraqi law experts in support of their respective positions." *Id.* Not surprisingly, considering the difficulty of ascertaining foreign law, the district court decided to "defer decision with respect to the content of Iraqi law." *Id.*

Given that the district court had trouble deciding such rudimentary questions as whether aiding and abetting and conspiracy are even causes of action under Iraqi law, and whether Iraqi law allows punitive damages, how can we expect the court to decide the far more challenging issues necessary to a full-scale trial? For instance, how will it decipher the standard of care for each cause of action, and determine whether there was a breach? It can rely on expert testimony, of course, but Iraqi law experts appear to disagree as to whether these causes of action are even cognizable. *See id.* Accordingly, the majority allows a federal court to go forward with litigation in which Iraqi citizens sue a U.S. contractor working hand-in-hand with the U.S. military in a war zone under Iraqi causes of action that may not even exist.

Under the majority's decision, military contractors face the prospect of drawn out lawsuits under the substantive tort law of every country in which they operate. Such a regime is unworkable in an era where the military has no choice but to contract with private corporations. In the present cases, for example, "a severe shortage" of military intelligence personnel "prompt[ed] the U.S. government to contract with private corporations to provide civilian interrogators and interpreters." J.A. 408. This use of private contractors was deemed essential to the achievement of U.S. military objectives. Yet, under the reasoning of the *Al-Quraishi* district court, which the majority allows to stand, the contractors should have paused to consider their potential liability under the substantive tort law of Iraq before agreeing to supply the military needed personnel under the government contract.

Of course, corporations generally must weigh their potential liabilities before agreeing to specific projects. The possibility of defending a lawsuit every time a foreign citizen claims a violation of foreign tort law might substantially alter the profitability of government contracts. Thus, before agreeing to perform the most critical intelligence functions in support of the U.S. military, contractors would be forced to investigate and analyze the substantive tort law of every country in which its employees might work. This unenviable task would be even more burdensome when the substantive tort law varies from jurisdiction to jurisdiction within a country, as it does in the United States.

In other words, a court that understandably had difficulty deciding such elementary questions as "Whether Aiding and Abetting and Conspiracy are Recognized Torts Under Iraqi Law and Whether Iraqi Law Allows Punitive Damages," *Al-Quraishi*, 728 F. Supp. 2d at 764, is implying that contractors, before playing a critical role in the U.S. military effort in Iraq, should have analyzed the nuances and permutations of every Iraqi tort law that might conceivably affect them. By forcing contractors to undertake a highly complex and deeply uncertain legal analysis before aiding our military operations, particularly those executed quickly and in countries whose legal systems are unstable and unfamiliar, the majority jeopardizes the military's ability to employ contractors in the future.

Like the courts, military contractors must rely on legal experts to analyze foreign law. One suspects that most Iraqi legal experts practice law in Iraq, and indeed, the *Al-Quraishi* plaintiffs relied on the declaration of an Iraqi attorney employed at an Iraqi law firm. Should the defendants have sought counsel from these Iraqi attorneys before helping the U.S. military with detention and interrogation functions? Should other contractors, before agreeing to aid in the U.S. military invasion of Iraq, have reached out to Iraqi lawyers for advice on the legal ramifications of such an attack under Iraqi tort law? Until now, these questions seemed far-fetched, but

they are newly valid considerations under a regime that sub-jects lawsuit-averse American corporations to the substantive tort law of Iraq. My point is not at all to disrespect Iraqi law or lawyers, but to query the feasibility of extensive and uncertain legal inquiries into any foreign law on the eve or in the execution of military operations.

2.

Unlike the district court in *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702 (D. Md. 2010), the district court in *Al Shimari v. CACI Premier Technology, Inc.*, 657 F. Supp. 2d 700 (E.D. Va. 2009) deferred any ruling on the choice of law issues. *See id.* at 725 n.7. As Judge King noted in his dissent from the now-vacated panel opinion, the *Al Shimari* plaintiffs argue that CACI is "liable to them *under Virginia law* for the torts of assault and battery, sexual assault, intentional and negligent infliction of emotional distress, and negligent hiring and supervision." *Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413, 427 (4th Cir. 2011) (King, J., dissenting) (emphasis added). The plaintiffs, after all, are pressing Virginia causes of action, and thus if the suit is allowed to go forward, the question of whether Virginia tort law applies extraterritorially must be seriously asked. The answer to this question is clear: the application of Virginia tort law to overseas battlefield conduct by contractors acting under U.S. military authority is as problematic as the application of Iraqi law.

First, there is no indication whatsoever that the Commonwealth of Virginia has any interest in having its tort law applied abroad in these types of cases. Absent a contrary legislative intent, we assume that legislatures do not want their tort law to apply extraterritorially. For instance, in *EEOC v. Arabian American Oil Co.* ("*Aramco*"), 499 U.S. 244 (1991), the Supreme Court held that Title VII of the Civil Rights Act of 1964 does not apply extraterritorially to regulate the employment practices of U.S. employers who employ U.S. citizens abroad. *Id.* at 246-47. In reaching this conclusion, the

Court relied on the "longstanding principle" that "'legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* at 248 (citation omitted). Given that "Congress legislates against the backdrop of the presumption against extraterritoriality," the Court stated, "unless there is 'the affirmative intention of the Congress clearly expressed,' we must presume it 'is primarily concerned with domestic conditions.'" *Id.* (citations omitted). Ultimately, the Court concluded that the petitioners had failed to provide sufficient evidence that Congress intended Title VII to apply abroad. *Id.* at 259.

Citing *Aramco*, the Supreme Court recently reiterated these principles in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), where it held that § 10(b) of the Securities Exchange Act of 1934 does not apply extraterritorially. *Id.* at 2877-78, 2883. The Court reasoned that "[t]he results of judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality." *Id.* at 2881. "Rather than guess anew in each case," the Court continued, "we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.*

Similarly, in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the Court concluded that judges must apply a "plain statement rule" before upsetting the standard constitutional balance of federal and state powers. *Id.* at 460-61. "[I]f Congress intends to alter the usual constitutional balance," the Court explained, "it must make its intention to do so unmistakably clear in the language of the statute." *Id.* at 460 (internal quotation marks omitted). "In traditionally sensitive areas," the Court continued, "the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Id.* at 461 (internal quotation marks omitted).

*Aramco*, *Morrison*, and *Gregory* all involved the "long-standing principle" that "'legislation of *Congress*, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Aramco*, 499 U.S. at 248 (emphasis added) (citation omitted). However, given that the Constitution entrusts foreign affairs to the federal political branches, *see* U.S. Const. art. I, § 8, cls. 1, 11-15; art. II, § 2, cls. 1-2, limits state power over foreign affairs, *see id.* art. I, § 10, and establishes the supremacy of federal enactments over state law, *see id.* art. VI, cl. 2, the presumption against extraterritorial application is even stronger in the context of state tort law.

It defies belief that, notwithstanding the constitutional entrustment of foreign affairs to the national government, Virginia silently and impliedly wished to extend the application of its tort law to events overseas. Or further, that it would do so in active disregard of Supreme Court pronouncements. For the Court has repeatedly stated that the federal government has exclusive power over foreign affairs, and that states have very little authority in this area. In *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), for instance, the Court noted, "'[T]he United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality. It is invested with power over all the foreign relations of the country, war, peace and negotiations and intercourse with other nations; all of which are forbidden to the state governments.'" *Id.* at 605 (citation omitted). The Court reiterated these principles in *United States v. Belmont*, 301 U.S. 324 (1937), emphasizing that "[g]overnmental power over external affairs is not distributed, but is vested exclusively in the national government." *Id.* at 330. The *Belmont* Court further noted that "complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." *Id.* at 331. Likewise, in *Hines v. Davidowitz*, 312 U.S. 52 (1941), the Court stressed that "[o]ur system of government is such that . . . the interest

of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.* at 63.

Such interference is precisely what we invite by ascribing to the fifty states the unexpressed wish that their tort law govern the conduct of military operations abroad. The principle against such interference holds even where the executive branch insists that the state law does not interfere with the foreign relations power. For instance, in *Zschernig v. Miller*, 389 U.S. 429 (1968), the Supreme Court struck down an Oregon probate law as "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432. Although "[t]he several States . . . have traditionally regulated the descent and distribution of estates," the Court concluded, "those regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440. In its brief amicus curiae, the Department of Justice stated, "The government does not . . . contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations." *Id.* at 434. The Court disregarded this statement, reasoning that the state action might cause "disruption or embarrassment" that the Justice Department failed to appreciate. *Id.* at 434-35, 441. In concurrence, Justice Stewart was even less deferential toward statements from the executive branch:

> We deal here with the basic allocation of power between the States and the Nation. Resolution of so fundamental a constitutional issue cannot vary from day to day with the shifting winds at the State Department. Today, we are told, Oregon's statute does not conflict with the national interest. Tomorrow it may.

*Id.* at 443 (Stewart, J., concurring).

3.

So too here, we are hardly required to defer to the Justice Department's statements that these cases should go forward. The Department urges us to

> hold that state tort law claims against contractors are generally preempted if similar claims brought against the United States would come within the FTCA's combatant activities exception and if the alleged actions of the contractor and its personnel occurred within the scope of their contractual relationship with the government, particularly if the conduct occurred while contractor personnel were integrated with the military in its combat-related activities.

Br. of United States at 2-3.

So far, so good. And one would think that this would be the end of it. However, the Department carves out an exception where "a contractor has committed torture as defined in 18 U.S.C. § 2340," the federal anti-torture statute. *Id.* at 3. The government then elaborates further on its proposed exception by implying that state-law tort remedies need not be available going forward "in light of measures subsequently instituted by Congress and the Executive Branch, and other developments in the aftermath of Abu Ghraib." *Id.* at 23. Like the Justice Department's brief in *Zschernig*, this vaguely explained and inexplicably derived exception is not entitled to deference by this court. As the Supreme Court only recently reiterated, "[T]he separation of powers does not depend on . . . whether 'the encroached-upon branch approves the encroachment.'" *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010) (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

The government does not point to a single expression of congressional intent in support of permitting state law tort

claims to apply overseas based solely on the nature of the allegations. Instead, it asserts that "in the limited circumstances where the state law claim is based on allegations that the contractor committed torture, as defined in 18 U.S.C. § 2340, courts should take into account the strong federal interests embodied in that federal law." Br. of United States at 22. In these circumstances, the government suggests, "the totality of the federal interests is different and does not require that state-law tort suits against contractors be preempted." *Id.* at 3.

It is difficult to see how 18 U.S.C. § 2340—which exhibits an interest in punishing torture through *federal criminal* prosecution—demonstrates any congressional interest in permitting torture-based state tort claims. The federal anti-torture statute, 18 U.S.C. § 2340 *et seq.*, does not even contain a private right of action. And in any event, courts have no license to create exceptions based on helter-skelter application of federal criminal statutes, exceptions that permit otherwise preempted state tort claims to go forward.

It is elemental that a federal court cannot simply engraft on its own a federal criminal law standard onto state tort claims. The federal judiciary is not permitted to reconfigure the elements of a state law cause of action. For as the "[Supreme] Court recognized in [*Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399 (1988),] the responsibility for defining the elements and scope of a state cause of action rests with the state legislature and state courts." *Childers v. Chesapeake & Potomac Tel. Co.*, 881 F.2d 1259, 1265 (4th Cir. 1989).

This court requested the government's submission of an amicus brief here, and I am appreciative of that submission. However, the government's amicus position is at odds with its own conduct. If the government believes that there have been contractual or criminal violations on the part of its own contractors, then it should proceed to exercise its unquestioned contractual and prosecutorial authority to go after the culpable

party. *See infra* Part II.B. If it does not believe such violations have occurred, it should say so. But given the significance of this case, the exclusive competence of the federal government in the field of foreign affairs, and the principles articulated in *Aramco*, *Morrison*, and *Gregory*, neither the federal executive nor the federal judiciary is entitled to assume that states want their tort law applied extraterritorially absent a plain statement to the contrary.

Here there is no indication that the Commonwealth of Virginia intended to apply its laws of assault, battery, sexual assault, intentional and negligent infliction of emotional distress, and negligent hiring and supervision to the battlefield conduct of contractors integrated into the wartime activities abroad of the U.S. military. A state's interest in employing a tort regime is largely confined to tortious activity within its own borders or against its own citizens. It is anything but clear that Virginia has any interest whatsoever in providing causes of action that allow foreign citizens that have never set foot in the Commonwealth to drag its own corporations into costly, protracted lawsuits under who-knows-what legal authority.

Notwithstanding the presumption against extraterritorial application of state law and the absence of any indication that the Commonwealth wants its tort law applied to battlefield conduct, the *Al Shimari* plaintiffs ask the district court to apply Virginia tort law to war-zone conduct that took place over 6,000 miles away. It is difficult to find a limiting principle in the plaintiffs' analysis. Under their approach, Virginia tort law—and the tort regimes of all fifty states—can be applied to conduct occurring in every corner of the earth. By allowing plaintiffs' causes of action to go forward, the majority lends its imprimatur to the extraterritorial application of state tort law. Reading the majority's opinion, I wonder if my friends will next launch state tort law into outer space.

4.

Even if the Commonwealth had somehow intended the extraterritorial application of its tort law, which it has not, the Supreme Court has made clear that state laws aimed at influencing foreign relations cannot stand when they conflict with federal objectives. In *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), for example, the Court invalidated a Massachusetts law that restricted state agencies from purchasing goods or services from companies doing business with Burma. *Id.* at 366. The Court reasoned that the state law was "an obstacle to the accomplishment of Congress's full objectives" under a federal law that directed the President to develop a comprehensive, multilateral strategy toward Burma. *Id.* at 369, 373. By "imposing a different, state system of economic pressure against the Burmese political regime," the Court explained, "the state statute penalizes some private action that the federal Act (as administered by the President) may allow, and pulls levers of influence that the federal Act does not reach." *Id.* at 376. Consequently, the Court explained, the Massachusetts law could not stand because it "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Id.* at 381.

Similarly, in *American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003), the Court struck down California's Holocaust Victim Insurance Relief Act, which required any insurer doing business in the state to disclose information about Holocaust-era insurance policies. *Id.* at 401. The Court began by noting,

> There is . . . no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the

> Constitution's allocation of the foreign relations power to the National Government in the first place.

*Id.* at 413 (citation omitted). In the context of Holocaust-era insurance claims, explained the Court, "California seeks to use an iron fist where the President has consistently chosen kid gloves." *Id.* at 427. Accordingly, the Court held that the state statute was preempted because it "interferes with the National Government's conduct of foreign relations." *Id.* at 401.

Under *Crosby* and *Garamendi*, states are prohibited from obstructing the foreign policy objectives of the federal government. There can be no question that there is obstruction here, where the federal law, speaking with one voice, can potentially be supplanted by the fifty different voices of varying state tort regimes, each one potentially working at cross-purposes with federal aims. Thus, even if Virginia wanted to extend its tort law to overseas battlefield conduct of military contractors, it cannot create an "obstacle to the accomplishment of Congress's full objectives" under federal law. *Crosby*, 530 U.S. at 373. Because Congress has emphatically forbid tort law from governing battlefield conduct, any attempt to "impos[e] a different, state system" on the battlefield, *id.* at 376, would impermissibly "interfere[ ] with the National Government's conduct of foreign relations," *Garamendi*, 539 U.S. at 401.

### B.

In contrast to the Commonwealth of Virginia, Congress has a constitutionally protected role in foreign affairs. *See* U.S. Const. art. I, § 8, cls. 1, 11-15. Congress undoubtedly has the power to allow private parties to pursue tort remedies against war-zone contractors operating under military authority. "[T]he Constitution contemplated that the Legislative Branch have plenary control over . . . regulations, procedures and remedies related to military discipline . . . ." *Chappell v. Wal-*

*lace*, 462 U.S. 296, 301 (1983). Congress could thus do what the majority has asserted its own right to do, namely to authorize foreign nationals as private attorneys general to police contractor conduct in theatres of armed combat. However, contrary to the plaintiffs' assertions, there is no indication that Congress has pursued any such course.

Plaintiffs contend that the Federal Tort Claims Act ("FTCA") permits private parties to bring state law tort suits against military contractors for wartime conduct. In analyzing this claim, we must adhere to the longstanding presumption that Congress does not permit private parties to interfere with military operations absent explicit statutory authorization. "[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs," *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988), and this hesitance to transgress constitutional boundaries applies fully to our interpretation of statutes. *See Feres v. United States*, 340 U.S. 135, 146 (1950) (declining to read the FTCA's broad waiver of sovereign immunity to allow military personnel to sue the government for service-related injuries even though no provision explicitly prevents them from doing so); *see also United States v. Johnson*, 481 U.S. 681, 690 (1987) (reaffirming the holding in *Feres* because "suits brought by service members against the Government for injuries incurred incident to service . . . are the '*type[s]* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" (emphasis in original) (citation omitted)).

To adopt plaintiffs' reading of the FTCA would require us to abandon this tradition of restraint. This broadly phrased statute does not contain anything close to a congressional authorization to private parties to hale war-zone military contractors into civilian courts. At most, it provides that "the term 'Federal agency' . . . does not include any contractor with the United States." 28 U.S.C. § 2671. But that broad definitional

provision does not mean that "contractors . . . are expressly excluded from the FTCA's reach" in the area of battlefield torts. *Al Shimari*, 658 F.3d at 435 (King, J., dissenting). For a "general statutory rule usually does not govern unless there is no more specific rule," *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989), but here there is another provision of the FTCA that speaks more specifically to whether military contractors are immune from these tort actions.

That provision is the combatant activities exception, which preserves the government's sovereign immunity against "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). Multiple textual clues in this exception indicate that Congress wanted to keep tort law out of the battlefield regardless of a defendant's status as a soldier or a contractor.

To start with, the exception bars claims "arising out of" combatant activities, *id.*, and this phrase is among the broadest in the law. "[I]n workmen's compensation statutes," for instance, "[t]he arising-out-of test is a familiar one used . . . to denote *any* causal connection between the term of employment and the injury." *Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (emphasis in original) (footnote omitted). Indeed, the use of this phrase in other FTCA exceptions has precluded a wide range of actions. For instance, the "sweeping language" of 28 U.S.C. § 2680(h)—which preserves the government's sovereign immunity against claims "arising out of assault [or] battery"—bars not only battery actions, but negligence claims that "stem from a battery" as well. *United States v. Shearer*, 473 U.S. 52, 55 (1985) (plurality opinion); *see also Kosak v. United States*, 465 U.S. 848, 854 (1984) (equating "arising in respect of" in 28 U.S.C. § 2680(c) with "arising out of" and observing that the former "encompassing phrase . . . seems to sweep within the exception all injuries associated in any way with the 'detention' of goods"). Congress wanted to forbid tort suits stemming from combatant

activities, and it chose in "[a]ny claim arising out of" a broad and widely recognized prohibitory term.

The exception's use of the term "combatant activities" does not denote a narrow subset of military operations but a legislative intention to prevent tort from entering the battlefield. This term encompasses "not only physical violence, but activities both necessary to and in direct connection with actual hostilities," *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948), and therefore has a considerable sweep. As the Supreme Court has noted, this provision "paint[s] with a far broader brush" than other FTCA exceptions that bar suits arising out of a subset of harms associated with a particular area. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 489-90 (2006) (contrasting the combatant activities exception in § 2680(j) with § 2680(b), which preserves immunity for "just three types of harm" associated with mail delivery). Given the broad language of the combatant activities exception, it is difficult to believe that Congress wanted the sensibilities of tort to govern the realities of war.

Indeed, as the District of Columbia Circuit recognized, "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield." *Saleh*, 580 F.3d at 7. Congress insulated the theatre of war from tort law because it "recognize[d] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Koohi v. United States*, 976 F.2d 1328, 1337 (9th Cir. 1992). In order to shield "[a]ny claim arising out of the combatant activities of the military" from tort liability, Congress used some of the broadest language possible when drafting this exception. It is not our role to dismember this exclusion's text in order to determine when and to what extent torts can arise from combatant activities after all.

If this textual evidence were not enough, the Supreme Court has refused to read the FTCA to authorize tort suits

against defense contractors, albeit in a slightly different context. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 511-12 (1988). The contractor in *Boyle* provided a helicopter for the military rather than aid in a war-zone, *id.* at 502, but the logic is the same. Because the FTCA's discretionary function exception precluded suits against the government for design defects in military equipment, *Boyle* held that it barred those actions against defense contractors as well. *Id.* at 511-12. As the Court observed, "[i]t makes little sense to insulate the Government against financial liability . . . when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 512.

I recognize that the temptation exists to exalt the brave men and women who defend our nation in time of war, and then, in the next breath, to disparage contractors as some sort of evil twin responsible for wars' inevitable missteps and excesses. But the FTCA does not permit such a dichotomy. It makes even less sense than in *Boyle* to shield the military from litigation for the battlefield activities of soldiers but not contractors. In *Boyle*, the Supreme Court did not even require a military-specific exception before insulating military contractors from design-defect liability. Instead, the Court relied on the discretionary function exception, which is not specific to military operations but instead broadly precludes claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a); *Boyle*, 487 U.S. at 511-12. Here, by contrast, Congress has provided an exception that singles out claims "arising out of . . . combatant activities." 28 U.S.C. § 2680(j). If the Supreme Court was willing to read the former general provision to cover military contractors, it would not hesitate to do the same with the latter more targeted exception.

In addition to enacting the combatant activities exception, Congress has indicated its desire to keep tort law off the bat-

tlefield by subjecting certain military contractors to other forms of discipline for war-zone conduct. For instance, the Uniform Code of Military Justice ("UCMJ") applies not only to members of our military, but to "persons serving with or accompanying an armed force in the field" in "time of declared war or a contingency operation" as well. 10 U.S.C. § 802(a)(10). The Military Extraterritorial Jurisdiction Act likewise subjects these contractors to domestic criminal sanctions by punishing anyone who, "while employed by or accompanying the Armed Forces" abroad, "engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 3261(a)(1). Unlike the application of state tort law, these procedures for holding contractors accountable were approved by Congress.

Ignoring the military risks and legal constraints that prohibit extraterritorial application of state tort law, the majority inserts tort into the battlefield by allowing these suits to go forward. But before applying state tort law to the combat activities of contractors working under the U.S. military, we should make certain that the legislative branch has authorized us to do so. As the Supreme Court explained in *United States v. Stanley*, 483 U.S. 669 (1987), "[T]he insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches . . . counsels hesitation in our creation of damages remedies in this field." *Id.* at 682. Because I find no evidence that Congress has recruited private parties—much less foreign nationals—to police the frontline, I cannot join my colleagues' decision to the contrary.

## C.

Instead of deferring to Congress's valid exercise of its constitutionally granted powers, the majority places contractor

accountability in the hands of the unaccountable. Thanks to the majority's efforts, contractors that were previously subject to the control of the executive have new judicial masters. But when unelected judges render contestable decisions about military policy in the course of applying tort law to contractors, the public will be unable to remove them from their posts. This flies in the face of our constitutional tradition of ensuring some popular control over the prosecution of a war. As the Supreme Court has explained, "[M]atters of warmaking belong in the hands of those who are . . . most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion).

No one will contend that tort law, however derived and defined, is a field excelling in precision. The vagueness and indeterminacy of these cut-and-paste causes of action will permit judicial discretion and jury variability to govern this most sensitive of areas. Courts must henceforth set the standards of care in matters of wartime captures, detentions, and interrogations as well as the measure of damages for the same. Not only that, but methods of interrogation and procurement of intelligence will be at the sufferance of a single judicial officer, safely ensconced in a secure courtroom, passing judgment on battlefield conduct thousands of miles away. Litigants will plead as a matter of course to the breach of whatever may seem the prevailing standard of care, thus setting in motion logistical problems inherent in transcontinental tort suits of such novel stripe.

The results of the rising tide of litigation will be both unpredictable and contradictory, as particular judges and juries debate and disagree over which methods of detention and interrogation are permissible. And as detention of the enemy becomes a more litigious enterprise, the incentives to shortcut capture with more lethal and unmanned measures may rise. Whether or not one approves of transplanting the delicacy and etiquette of the judicial branch into a theatre of war is not the question. These lawsuits presage a massive

transfer of authority reserved to the political branches under Articles I and II of our Constitution into judicial hands, and to a single trial judge and jury to boot. This is a subject one would expect Congress to address in great and meticulous detail, as it has, for example, in the Military Commissions Act of 2009, Pub. L. 111-84, 123 Stat. 2190, 2574-614, the Military Commissions Act of 2006, Pub. L. 109-366, 120 Stat. 2600, and the Detainee Treatment Act of 2005, Pub. L. 109-148, 119 Stat. 2739, and I respectfully take issue with the matter-of-fact manner in which the gravity of the step taken is not even acknowledged by the majority, much less addressed.

By opening the door to the extraterritorial application of different state tort regimes, the majority allows for unlimited variation in the standard of care that is applied to critical combatant activities. There is not a widely agreed upon standard of care for overseas detentions and interrogations, and different states will allow different causes of action to go forward and will apply different standards to them. And even if there were an agreed upon standard—which there is not—particular judges and juries would apply that standard inconsistently. Such a standard would probably bottom out on some version of reasonableness. But in the context of detention and interrogation, what exactly does reasonableness mean? That question could provoke innumerable answers, and the very vagueness of tort formulations as to the standard of care means that civilian jurors will be setting the standards for detention and interrogation of military detainees without knowledge of conditions that obtain in a zone of combat halfway across the globe. I imply no disrespect of jurors who give of their time and good sense to our system of justice, but this system will provide no guidance and no predictability whatsoever because it will leave the conduct of military functions to the fortuities of litigious hindsight.

Contractors can be forgiven for not wanting to entrust their employees to the vagaries and caprice of individual verdicts

and trials. Add to that the prospect of punitive damages and other uncertain measures of recovery, and one will introduce into the detention and interrogation process a degree of risk aversion that could well result in the gathering of as little vital intelligence as possible. While some may regard reduced interrogations with satisfaction, those whose lives and fortunes depend upon the acquisition of vital intelligence are not likely to join any chorus of approval.

The majority's response is undoubtedly that all these questions remain to be "ironed out." But such words are small comfort to those who must make critical decisions in the field while we sit here in Virginia or Maryland or whatever other venue is doing the "ironing."

By dismissing these appeals, the majority only drifts and dawdles, sparing itself the need to come to grips with the issues, and kicking the can far down the road. The majority fails to recognize that this is a matter of some urgency. Just for starters, commanders in the field need actionable battlefield intelligence in order for soldiers to survive. Few wars have been or will be prosecuted successfully without intelligence that permits units to plan accurate strikes against enemy forces, and every bit as importantly, to know when lethal force is plotted against Americans themselves. Actionable intelligence has always had both offensive and defensive value. In other words, intelligence not only assists us in prevailing; it saves American lives.

While there is legitimate debate about how intelligence is best obtained, a tort suit is probably the very worst forum in which that issue can or should be resolved. The judges and juries who review those matters cannot fairly be expected to possess a background in the utility of different forms of military intelligence, and to ask them to decide such sensitive, delicate, and complicated questions is, in a word, unrealistic. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1286-87 (11th Cir. 2009) (explaining that military

intelligence-gathering is traditionally insulated from judicial review); *United States v. Truong Dinh Hung*, 629 F.2d 908, 913-14 (4th Cir. 1980) (noting that "the courts are unschooled in diplomacy and military affairs, a mastery of which would be essential to passing upon" matters of intelligence). None of this is to say, of course, that military contractors are without fault or that abuses should ever go unremedied. It is simply to make the point that something as mischievous as the placement of tort law in military calculations should be approved by some body capable of appreciating the consequences of its action and constitutionally entrusted with the task.

## II.

### A.

While the present suits may focus upon methods of interrogation and conditions of detention, the issue is larger even than that. In assuming that tort suits are a preferred method of policing the contractors who assist military operations, the majority obscures the fact that there exists a more proper remedy in this area. In the absence of some contrary expression by the Congress, the most basic precepts of separation of powers require that the alleged abuses of military contractors must be addressed through the medium of contract, not through tort. In short, without a clear manifestation of Article I congressional intent, Article II mandates that contractual, not tort remedies, be utilized.

It is a truism that government, including the military, must contract. Few, if any, governmental tasks are undertaken today without some form of public-private partnership. The federal government routinely carries out sensitive public functions through private entities, from running background checks, *see United States v. Virginia*, 139 F.3d 984, 986 (4th Cir. 1998), to rehabilitating prisoners, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 n.1 (2001), to investigating criminal activity, *see United States v. Warshak*, 631 F.3d 266, 320

(6th Cir. 2010). Assisting with combat operations is no different. There is "ample evidence that the military finds the use of civilian contractors in support roles to be an essential component of a successful war-time mission." *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008). The Department of Defense "employs around 170,000 military contractors on a yearly basis, having more than doubled its use of contracting services since 2001." Lauren Groth, *Transforming Accountability: A Proposal for Reconsidering how Human Rights Obligations Are Applied to Private Military Security Firms*, 35 Hastings Int'l & Comp. L. Rev. 29, 38 (2012).

Apart from being necessary, the military's partnership with private enterprise has salutary aspects as well. For one thing, it permits our all-volunteer military to handle troop shortages in a cost-efficient manner. According to the Army Field Manual, "[r]ecent reductions in military structure, coupled with high mission requirements and the unlikely prospect of full mobilization, mean that to reach a minimum of required levels of support, deployed military forces will often have to be significantly augmented with contractor support." U.S. Dep't of the Army, Field Manual 3-100.21, Contractors on the Battlefield Preface (2003). Because of these changes in our military, "the future battlefield will require ever increasing numbers of often critically important contractor employees." *Id.*

These partnerships also allow the military and its contractors to pool their respective expertise and bring the best of public service and private industry to bear on the mission at hand. This reliance on contractor expertise will become only more necessary as warfare becomes more technologically demanding. As the Army Field Manual notes, "the increasingly hi-tech nature of our equipment . . . [has] significantly increased the need to properly integrate contractor support into all military operations." *Id.* War is not a static enterprise, and our military will need every bit of the edge that technological expertise affords in order to face the hostilities of the

future. Only the clueless believe future battlefields will not prominently feature private contractors.

## B.

Given these realities, it is illusory to pretend that these suits are simply ordinary tort actions by one private party against another. Instead, because contractors regularly assist in "the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible . . . to the electoral process," *see Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), a decent respect for the separation of powers compels us to consider what sort of remedy would best ensure the authority of the executive over those with whom it partners in carrying out what are core executive functions. The answer is obvious. Unlike tort, contract law gives the executive branch a mechanism of control over those who regularly assist the military in performing its mission.

For one thing, contract law is a more textually precise field than tort law, allowing the executive branch to set the standard of care in the terms of the contract. In contrast to tort suits in which judges would have to decide what constitutes a "reasonable bombing," *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1350 (11th Cir. 2007), a "prudent intercept," *Tiffany v. United States*, 931 F.2d 271, 279 (4th Cir. 1991), or a legitimate interrogation method, contract cases would turn on more definite language in the contract itself— language that reflected the policy choices of a democratically accountable branch. Rather than rely on the judicial application of some indeterminate standard of reasonable care, the executive branch could require contractors to abide by well-established military rules and manuals in the terms of its contractual agreement. For instance, the government could direct military contractors to "adhere to the standards of conduct established by the operational or unit commander." *See Ibrahim v. Titan Corp.*, 556 F. Supp. 2d 1, 6 (D.D.C. 2007) (internal quotation mark and citation omitted). Focusing on the

government's contract rather than theories of tort would also ensure that important federal interests were not "left to the vagaries of the laws of the several States," but instead "governed by uniform rules" in the contracts themselves. *Carlson v. Green*, 446 U.S. 14, 23 (1980). The majority, however, appears to prefer judicial supervision through malleable and multiple tort standards to executive control through clearer and more consistent contractual provisions.

Contract law also gives the executive branch, as party to the contract, the opportunity to pursue a variety of remedies. In addition to being able to sue a contractor in the event of a breach, the executive can create more tailored sanctions in the terms of the contract itself. The government, for example, could contractually reserve the right to demand that its contractor "remove . . . any employee for reasons of misconduct," *see Ibrahim*, 556 F. Supp. 2d at 7 (omission in original), thereby allowing it to jettison bad apples without jeopardizing an entire military operation.

These contractual tools are not the only ones available to the executive branch. They are augmented by a web of regulations to which contractors subject themselves by partnering with the military. Army Regulations, for example, permit commanders to "apprehend and detain contractors for violations of the law" as well as "restrict or revoke . . . access to Army facilities or installations for disciplinary infractions." Army Reg. 715-9 § 4-2(e). What is more, the government can pursue military sanctions against contractors for battlefield misconduct under the UCMJ, *see* 10 U.S.C. § 802(a)(10), as well as domestic criminal punishments against contractors for crimes committed abroad, *see* 18 U.S.C. § 3261(a)(1). Just within this circuit, in *United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009), a "paramilitary contractor" was convicted of federal assault charges arising out of the lethal interrogation of a detainee in Afghanistan. *See id.* at 210-12. The government has employed its prosecutorial powers to punish rogue interrogators in the past, and I see little reason why it would

forswear the use of such sanctions in the future. *See Saleh*, 580 F.3d at 2 (noting that in the wake of the events at Abu Ghraib, the executive branch obtained convictions of a number of soldiers involved and pursued "extensive investigations" into allegations of abuse by contractors).

When combined with contractual tools, these laws provide the executive branch with an arsenal of remedies ranging from removal of a specific contractor to criminal punishment. The executive requires "a degree of discretion" in the area of national security, *see United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), and this selection of sanctions gives it an appropriate amount of flexibility. Because the military and its contractors are tightly bound, litigation in federal court often subjects both to judicial process. Unlike tort suits instigated at the behest of private parties, contractual and criminal enforcement permits the executive to protect military commanders and contractors from being "unnecessarily and dangerously distracted by litigation half a world away" and to prevent "discovery into military operations" from "intrud[ing] on the sensitive secrets of national defense." *See Hamdi*, 542 U.S. at 532 (plurality opinion).

In sum, it is silly to think that without tort suits, military contractors will simply be wandering around war zones unsupervised. What the chain of command does for military officers, contract law does for military contractors. As the Army Field Manual notes, "The military chain of command exercises management control through the contract." U.S. Dep't of the Army, Field Manual, *supra*, § 1-25. "[P]roper military oversight of contractors is imperative" to integrating these private actors into military operations, *id.* § 1-23, and contract law achieves this goal in ways that tort law cannot. Even though contractors are not formally "part of the operational chain of command," they are "managed in accordance with the terms and conditions of their contract" through the Contracting Officer Representative, who "serves as the operational commander's primary oversight." Army Reg. 715-9

§ 4-1(c)-(d). Thus, contract law ensures that these contractors are "subject to military direction, even if not subject to normal military discipline." *Saleh*, 580 F.3d at 7. In other words, "the Government's broad authority . . . in managing its operations does not turn on" whether "contract employees" or "civil servants" are involved. *NASA v. Nelson*, 131 S. Ct. 746, 758-59 (2011) (citation omitted).

Tort law, however, conflicts with rather than complements these contractual mechanisms of control by "interfer[ing] with the federal government's authority to punish and deter misconduct by its own contractors." *See Saleh*, 580 F.3d at 8. The majority's allocation of common law remedies is paradoxically not just a matter of common law. It is a decision concerning which branch of government will control the contractors that assist our soldiers on the battlefield. Whereas contract and criminal law places contractor accountability where Article II places it—in the hands of the executive—tort law places it in the hands of the judiciary. But the executive branch—and not the judicial—is responsible for overseeing a war effort under the Constitution. Whereas the President is required as Commander in Chief "to take responsible and continuing action to superintend the military," *Loving v. United States*, 517 U.S. 748, 772 (1996), we as judges are "not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953).

It is disquieting to say the least that the majority now believes it can displace, or to use a euphemism, "supplement" executive control of military contractors with judicial oversight. The costs of that decision will be severe. For one thing, it bleeds together two areas of law—tort and contract—that are conceptually distinct. No one disputes that those contractors who actually engage in torture breach those provisions of their contracts that require them to act in accordance with federal law. But a "[b]reach of contract is not a tort," *XCO Int'l Inc. v. Pac. Scientific Co.*, 369 F.3d 998, 1002 (7th Cir. 2004), and it only muddies the law to permit private litigants to bring

tort suits against contractors just because the latter allegedly violated an agreement with the executive. "[T]he main currents of tort law run in different directions from those of contract," *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 873 n.8 (1986), and it does little good to attempt to channel them together.

C.

At bottom, the majority's facilitation of tort remedies chills the willingness of both military contractors and the government to contract. I have previously discussed the chilling effect today's decision will have on private contractors, *see supra* Part I, but I fear that the majority's efforts will discourage the government from partnering with private industry as well. Congress might well think the defense budget large enough without courts adding the prospect of uncertain tort liabilities. By increasing through prospective tort suits the costs of employing contractors on the battlefield, the majority interferes with the executive branch's capacity to carry out its constitutional duties. To the Defense Department in an era of cost consciousness, the threat of tort liability can chill both the government's ability and willingness to contract by raising the price of partnering with private industry, and that is particularly true here. *Boyle* noted, in fact, that burdens of "tort suits" against military contractors "would ultimately be passed through . . . to the United States itself, since defense contractors will predictably raise their prices to cover . . . contingent liability." 487 U.S. at 511-12. So long as the executive branch could control contractual performance through contract law, it had little reason to eschew valuable partnerships with private enterprise. But now that third parties can pull contractors and their military supervisors into protracted legal battles, we can expect a distortion of contractor and military decisionmaking to account for that contingency. As the *Saleh* court explained, "Allowance of such suits will surely hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone

combat situations." 580 F.3d at 8. It will no longer be enough that military contractors meet their contractual commitments to a T, for there exists no assurance that the standard of care embraced in subsequent tort suits will incorporate by reference or otherwise the criterion of meeting one's contractual obligations.

"[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving*, 517 U.S. at 757. Today's decision does precisely that. "[T]he Government's practical capacity to make contracts" is "the essence of sovereignty itself." *United States v. Winstar*, 518 U.S. 839, 884 (1996) (internal quotation mark and citation omitted). By making the contract the essence of the government-contractor partnership, we diminish the capacity of our adversaries to erode this critical aspect of our national sovereignty through litigation. Conversely, by elevating tort as a mechanism of weakening this essential partnership, we give those who do not wish us well a means of putting their ill will to use. I can understand that our enemies would seek to use our own laws as a weapon against us, but I cannot understand why we should sanction suits, the unintended effect of which is to equip them.

## III.

Rather than engage in a frank discussion of the consequences that will ensue from its ruling, the majority seeks a cubby hole in the collateral order doctrine. This argument misses the mark—for many of the same reasons that tort law does not belong on the battlefield, this case does not belong back before the district court. We are engaged in a lot of semantic word games here, losing completely the forest for the trees. The collateral order doctrine is not a matter of legalistic banter, but of letting an appellate court confront in a timely manner issues presenting grave, far-reaching consequences. Before us is a deeply unfortunate instance of litigation creep where doctrines that postpone appeals in a

domestic context are transposed to an international setting without recognition of the gravity of such a shift of gears.

The collateral order doctrine is premised on the eminently reasonable conclusion that immunities from suit should be recognized sooner rather than later, because the "rigors of trial" can often be every bit as damaging as an adverse judgment. *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 870 (1994). Indeed, the "crucial distinction between a right not to be tried and a right whose remedy requires . . . dismissal" is whether the immunity in question would be eviscerated by the very process of litigation. *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 269 (1982).

Here, the asserted immunity can take on different labels —"law-of-war immunity," "*Boyle* preemption," or an inherently political question—but the underlying premise is the same: that suits for damages against private defendants arising out of military contracts performed in a theatre of war are not cognizable by the federal courts under state tort law. The point of this immunity is not to determine after all the vicissitudes of litigation who should win and who should lose. Rather, it is a recognition that sensitive military matters should be insulated at the outset from judicial scrutiny, and the cases to this effect are legion.

The majority's contrary holding is animated by a single mistaken belief: that "the denial of a preemption claim stemming from the combatant activities exception would not . . . entail significant scrutiny of sensitive military issues." *Ante* at 27. The majority expresses this confidence despite its observation that "the questions that will require proper answers . . . have yet to be fully ascertained." *Id.* at 34. At a minimum, it seems clear that the majority's pursuit of "the luxury of a complete record developed through discovery," *id.* at 33, "careful analysis of intrinsically fact-bound issues," *id.* at 34, and "exploration of the appellants' duties under their contracts with the government," *id.* at 34, contemplates full-fledged liti-

gation that will inevitably require the substantial scrutiny of military affairs.

But this is not just another day at the ranch. This is an extraordinary case presenting issues that touch on the most sensitive aspects of military operations and intelligence. The majority's proposed inquiry, "focuse[d] on whether the contractor complied with the government's specifications and instructions," *id.* at 27, must perforce entail bringing the military personnel who gave those instructions before a court halfway around the world. The Supreme Court has long cautioned against "compelled depositions . . . by military officers concerning the details of their military commands," which will only "disrupt the military regime." *Stanley*, 483 U.S. at 682-83.

Domestically, this sort of "broad ranging discovery and the deposing of numerous persons . . . can be peculiarly disruptive of effective government." *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). It carries the risks of "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at 816. In the context of the battlefield, the consequences are geometrically more dire, since the plaintiffs seek information about the interrogation methods and intelligence gathering techniques critical to our nation's success in combat. "Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering . . . ." *CIA v. Sims*, 471 U.S. 159, 175 (1985). I wonder how the majority expects an "inquiry focuse[d] on whether the contractor complied with the government's specifications and instructions," *ante* at 27, to be resolved without hauling before the district court the military officers who gave those instructions, exposing our national security apparatus in direct contravention of the Supreme Court's clear instructions to the contrary.

Because military contractors work at such close quarters with the military, judicial "inquiry into the civilian activities

[will] have the same effect on military discipline as a direct inquiry into military judgments." *Johnson*, 481 U.S. at 691 n.11. This is hardly a fanciful concern. Al-Quraishi, for instance, will likely seek discovery to validate the allegation in his complaint that "L-3 employees[ ] and CACI employees conspired with certain military personnel to torture prisoners." And the defendants are no better. CACI acknowledged at oral argument that, in order to produce sensitive military documents that would vindicate itself, it would push the discovery process against the military "as broadly as [it] possibly could."

This quite plainly is the stuff of immunity, not just some affirmative defense. Despite the Supreme Court's explicit admonition to the contrary, both parties frankly seek to "require members of the Armed Services" and their contractors "to testify in court as to each other's decisions and actions" in an attempt to sort out "the degree of fault," thereby undermining the private-public cooperation and discipline necessary for the execution of military operations. *See Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977). Both parties to this suit propose to go rummaging through the most sensitive military files and documents, seeking to prove or disprove a broad-reaching conspiracy to conduct the alleged illegal interrogations. I have no doubt that these proceedings will quickly "devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government's wartime policies." *Saleh*, 580 F.3d at 8.

By pitting uniformed soldiers and military contractors against one another, we will only "hamper the war effort and bring aid and comfort to the enemy," which will relish the opportunity to drag American soldiers into our "own civil courts" and thereby divert their "efforts and attention from the military offensive abroad to the legal defensive at home." *Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950). "[T]hese cases are really indirect challenges to the actions of the U.S.

military," *Saleh*, 580 F.3d at 7, and it "would be difficult to devise more effective fettering of a field commander than to allow" the suits the majority encourages today. *See Eisentrager*, 339 U.S. at 779.

Rather than allow this court to address the merits of the immunity question and decide once and for all whether the demands of national security preclude this suit, the majority prefers sending this litigation back to a lone district judge with no more guidance than to say that he should keep his finger in the dike and avoid discovery that imperils national security. The ringing klaxons that the Supreme Court has sounded in this area do not permit this casual approach. By the time this case gets back to this court for consideration of the selfsame immunity questions that we could perfectly well address right now, the litigation process may well have done its damage.

These were precisely the sort of concerns that animated the Supreme Court's extension of the collateral order doctrine to appeals pertaining to qualified immunity in *Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985). That case makes clear that the touchstone of the collateral order doctrine is whether delayed review would impose "consequences . . . not limited to liability for money damages." *Id.* at 526. Yet the majority refuses to even acknowledge that this case presents the same distinct dangers—and worse—that merited immediate appeal in *Forsyth*, preferring instead to act as if this were a typical personal injury case.

To justify this conclusion, the majority relies on semantics, ignoring the Supreme Court's instruction that the collateral order doctrine is to be given a "practical rather than a technical construction." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

First, the majority relies on a literal reading of the dictum that collateral appeals are reserved for "explicit statutory or

constitutional guarantee[s] that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989). The majority cites this lonely line for the sweeping and staggering conclusion that the interests protected by *Boyle* and *Saleh* are "*ipso facto*, not immunity." *Ante* at 25. But the Supreme Court has recognized that "explicit statutory or constitutional guarantee[s]" do not describe the whole of the collateral order doctrine. *Mitchell v. Forsyth* stands as an example of how "explicitness may not be needed for jurisdiction" to hear a collateral appeal. *Digital Equip.*, 511 U.S. at 876. What differentiates both qualified immunity and law-of-war immunity from the mass of claims that do not merit immediate review is their "good pedigree in public law." *Id.* In other words, these immunities are distinct because although the interests they protect are not specifically enshrined in legislative text, they are nonetheless vital to the protection of the common good, and serve more than the mere interest of a single individual in a favorable judgment.

Second, the majority examines *Boyle* with a microscopic eye, honing in on the fact that the case uses the word "liability" rather than "immunity." *See ante* at 25. First, this observation is not even correct—both the majority and the dissent in *Boyle* also describe the result as "immunity." *See, e.g.*, *Boyle*, 487 U.S. at 510 ("contractor immunity"); *id.* at 523 (Brennan, J., dissenting) ("contractor immunity"). Second, and more important, however, the Supreme Court has instructed that the courts of appeals should not "play word games with the concept of a 'right not to be tried.'" *Midland Asphalt*, 489 U.S. at 801. The majority recognizes this principle when convenient, *see ante* at 20 (quoting *Midland Asphalt*, 489 U.S. at 801), but chooses to ignore it when parsing *Boyle* with exegetic precision, *see ante* at 25-26. All that is relevant to the inquiry before us is that the rationale for *Boyle* was the same desire to avoid the "inhibition of discretionary action" that made immediate appeals necessary in *Mitchell v. Forsyth*. *Compare Boyle*, 487 U.S. at 511-13, *with Forsyth*, 472 U.S. at 525-26.

Given the fact that these cases simply bristle with novel, unprecedented questions, their duration is likely to be measured in years. It will in all likelihood be a long time indeed before they ever again reach the court of appeals, especially in view of the fact that the vote here will operate as a disincentive for any future certified appeals under 28 U.S.C. § 1292(b). District courts have been given a signal from this court that we do not want to be bothered by these appeals no matter how significant the issues might be. Today's opinion gives the district courts a green light to plunge without a scintilla of direction into the intractable difficulties and significant pitfalls of this litigation. The danger is precisely that which the collateral order doctrine is meant to forestall, namely the expenditure of years of litigation involving a succession of national security concerns in cases that plainly should be dismissed at the very outset. *See Will*, 546 U.S. at 353; *Gough v. Perkowski*, 694 F.2d 1140, 1145 (9th Cir. 1982). If the collateral order doctrine has no role in saving resources and sparing wasted efforts in a context such as this, then I fear it has been largely eviscerated in those situations where it would be of most use.

I recognize that people on both sides of these questions have the noblest intentions in mind, but we should not be oblivious to the profound changes that are occurring. It was once the case that judges of all persuasions went to great lengths to restrain themselves from entering theatres of armed conflict with prescriptions of their own, and this was true whether the conflict was regional or worldwide in its dimensions. *See, e.g.*, *Holtzman v. Schlesinger*, 414 U.S. 1304, 1309-10, 1315 (1973) (Marshall, Circuit Justice) (refusing to review air operations over Cambodia because, in part, "Justices of this Court have little or no information or expertise" with regard to sensitive military decisions and "are on treacherous ground indeed when [they] attempt judgments as to [the] wisdom or necessity" of executive military action); *Eisentrager*, 339 U.S. 763 (World War II); *Ex parte Quirin*, 317 U.S. 1 (1942) (World War II); *The Prize Cases*, 67 U.S.

(2 Black) 635 (1863) (The Civil War). But that era is ending. Perhaps it shall end, but how it ends is all important and I hate to see it pass not through law but through judicial ukase. As a matter of policy, one may prefer these suits go forward, but as a matter of law, they should be forthwith dismissed.

Under the majority's view of pertinent precedent, an officer denied qualified immunity for a wrongful arrest would be entitled to an immediate appeal of that decision, but the weighty questions of war and wartime policy at issue here must take their turn at the back of the line. What stands to be "irretrievably lost in the absence of an immediate appeal," *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 431 (1985), is whether decisions as to how America protects herself can be scrutinized through novel applications of extraterritorial causes of action unauthorized by any body charged by our charter with protection of this country's most vital security concerns. In allowing these suits to proceed, the majority has asserted for itself the responsibility of all others in our system: the right of Congress to authorize private tort actions challenging combatant activity overseas; the right of the executive to control wartime operations through its contractual and criminal law prerogatives; the right of the states not to assent to the extraterritorial application of their law; and the right (though not of constitutional dimension) of litigants and district courts to some notion of where this brave new world will lead. Perhaps this litigation is simply one of those small and tiny steps that weaken America only by increments and erode our constitutional structure only by degree. But I think this understates the matter. The touchstone of the collateral order doctrine is whether a trial "would imperil a substantial public interest" or "some particular value of a high order." *Will*, 546 U.S. at 352. To some questions the answers should be so apparent as not to require iteration, and so it is here.

Judge Niemeyer and Judge Shedd have indicated that they join this opinion.

NIEMEYER, Circuit Judge, dissenting:

The majority today disregards controlling Supreme Court precedents and belittles the gravity of the issues presented in these cases, purporting to find comfort in its narrow application of the collateral order doctrine. Its effort is regrettably threadbare.

Military contractors performing work in the Iraqi war zone under the command and control of the United States military have invoked our jurisdiction, claiming immunity from tort suits brought by foreign nationals detained as part of the war effort. As a matter of convenience, the majority ducks making a decision on this issue of greatest importance to the public interest because it feels that discovery and further district court proceedings would assist it in making a decision. But in giving that as a reason, the majority fails to follow the Supreme Court's *command* in *Behrens v. Pelletier*, 516 U.S. 299 (1996), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that we hear such claims of immunity *now*, simply on the basis of the complaint.

It is simply too easy to claim, as does the majority, that unresolved facts bar consideration now of the defendants' immunity claims. There are always unresolved facts. Without any explanation, the majority fails to recognize that the *undisputed facts of the plaintiffs' claims* alone allow a court to rule on the defendants' immunity claims *as a matter of law*.

It would appear that only the Supreme Court can now fix our wayward course.

* * *

The plaintiffs in these cases are Iraqi citizens, who were seized in Iraq and detained by the U.S. military in Abu Ghraib prison and other military prisons in Iraq. They commenced these actions under state tort law and the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350, for alleged injuries sustained from their mistreatment in prison at the hands of the defendants, who were U.S. military contractors, and of the military personnel themselves. As contractors hired by the U.S. military and under its control during the course of the war effort, the defendants in these two cases have asserted various immunities from liability and suit. They claim that the plaintiffs' claims are barred by (1) derivative sovereign immunity or derivative absolute immunity, as set forth in *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir. 1996); (2) immunity from tort liability in a war zone, as recognized under *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), *cert. denied*, 131 S. Ct. 3055 (2011); and (3) law-of-war immunity, as recognized by the Supreme Court in *Dow v. Johnson*, 100 U.S. 158 (1880). On the district courts' rejection of these claims of immunity or their refusal to grant immunity on motions filed under Rules 12(b)(1) and 12(b)(6), the defendants filed these interlocutory appeals.

The majority refuses to address whether the defendants enjoy any of the immunities asserted, holding that the district courts' decisions made on Rule 12(b)(1) and Rule 12(b)(6) motions are not final appealable orders and that we do not have appellate jurisdiction. With that decision, the majority subjects the defendants to litigation procedures, to discovery, and perhaps even to trial, contrary to the deep-rooted policies inherent in these immunities.

I would reject each of the reasons given by the majority for not deciding the immunity issues at this stage of the case and conclude that we undoubtedly have appellate jurisdiction *now* to consider them under the well-established principles of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1945), *Behrens v. Pelletier*, 516 U.S. 299 (1996), and their progeny. *Cohen* authorizes the immediate appeal under 28 U.S.C. § 1291 of important and collateral interlocutory orders that "have a final and irreparable effect on the rights of the parties." 337 U.S. at 545. And *Behrens* and *Iqbal* clearly

establish that these appeals fit comfortably with the *Cohen* collateral order doctrine because the denial of immunity "at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." *Iqbal*, 556 U.S. at 672 (citing *Behrens*, 516 U.S. at 307).

Each of the majority's reasons for denying review now is demonstrably flawed. In rejecting the right to appeal the district courts' denials of the derivative absolute immunity described in *Mangold*, the majority ignores well-established precedent that a district court's denial of an immunity from suit based on the facts as alleged in the complaint is a final, conclusive order that is immediately appealable as a collateral order. And in rejecting the right to appeal rulings on *Saleh* and law-of-war immunities, the majority rests heavily on a distinction between an immunity that provides "an insulation from liability" and "an immunity from suit," concluding that the immunities in this case only protect defendants from civil liability. This analysis misses the point, however. The Supreme Court has found orders denying immunity *in its common law sense* to be appealable by examining the function performed by parties claiming immunity, the interference with that function a denial of immunity would occasion, and the public interest. In reaching its conclusion, the majority fails to undertake this analysis or recognize the substantial government interest underlying these immunities, an interest with deep roots in the common law.

If there ever were important, collateral decisions that would qualify under *Cohen* as reviewable final decisions, the district courts' denials of immunity in these cases are such decisions. The defendants in these cases were engaged by the U.S. military to assist in conducting interrogations under the command and control of U.S. military personnel, and the decisions about the scope and nature of these interrogations were an integral part of the military's interests. Moreover, the military desperately needed to receive contractor assistance in its interrogations because of a substantial shortage of personnel.

Thus, the interrogations were a major component of the war effort, designed to gather military intelligence. These strong public interests merit our consideration of the federal common law immunities claimed by the defendants as protection from any civil suit and from any potential civil liability under state tort law.

Because we have appellate jurisdiction to address one or all of the forms of immunity claimed by the defendants, we would, at the outset, be required to decide our subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). When considering our jurisdiction, it is apparent that we, as well as the district courts, lack authority under Article III to entertain the actions because they present a nonjusticiable political question.

Accordingly, I would dismiss these appeals and remand them with orders to dismiss the cases as nonjusticiable attempts to engage the judiciary in questions reserved by the Constitution for Congress and the Commander-in-Chief to resolve.

I

In 2003, a multi-national force, led by the United States and Great Britain, invaded Iraq. During the course of the war, the U.S. military seized and detained Iraqi citizens suspected of being enemy combatants or thought to have value in possessing useful intelligence regarding the insurgency or other terrorist activities. These detainees were imprisoned in Abu Ghraib prison and other prisons throughout Iraq. Although these prisons were operated by the U.S. Army in an active war zone, "a severe shortage" of military intelligence personnel "prompt[ed] the U.S. government to contract with private corporations to provide civilian interrogators and interpreters." J.A. 408. These contractors included CACI Premier Technology, Inc., a subsidiary of CACI International, Inc. (collectively herein, "CACI") and Titan Corporation, now L-

3 Services, Inc. ("L-3"). CACI and L-3 were required to comply with Department of Defense interrogation policies and procedures when conducting "[i]ntelligence interrogations, detainee debriefings, and tactical questioning" of persons in the custody of the U.S. military. J.A. 270-71. Secretary of Defense Donald Rumsfeld testified before Congress that the linguists and interrogators provided by contractors at Abu Ghraib were "responsible to [the military intelligence] personnel who hire[d] them and ha[d] responsibility for supervising them." Hearing of the U.S. Senate Committee on Armed Services 44 (May 7, 2004). Acting Secretary of the Army Les Brownlee also testified that civilian linguists and interrogators "work[ed] under the supervision of officers or noncommissioned officers in charge of whatever team or unit they are on." *Id.*

The plaintiffs in these two actions are individuals who were seized and detained by the military at Abu Ghraib prison and other military-controlled prisons "during a period of armed conflict" and "in connection with hostilities." Second Amended Compl. ("Complaint") ¶ 497 (*Al-Quraishi*); Second Amended Compl. ("Complaint") ¶ 142 (*Al Shimari*). In their complaints, they allege various acts of assault, sexual assault, humiliation, and inhumane treatment at the hands of the defendants, their employees, and their co-conspirators in the military. They allege that during the course of providing interrogation and translation services for the U.S. military, employees of the defendant corporations conspired with each other and with members of the military to commit torture, assault, battery, and war crimes and that their conduct violated the terms of the contracts that CACI and L-3 had with the U.S. military, the provisions of the U.S. Army field manual, as well as United States law, state law, and the Geneva Convention. Complaint ¶¶ 418, 430, 450, 454, 463, 470 (*Al-Quraishi*); Complaint ¶¶ 67, 88, 94, 98, 107, 108 (*Al Shimari*). In addition, they allege that the defendants conspired with each other and with members of the U.S. military to cover-up the misconduct and hide it from the authorities.

The complaints purport to state causes of action under various state-defined torts and under the Alien Tort Statute, naming as defendants CACI, L-3, and Adel Nakhla, an individual employee of L-3, and they demand compensatory damages for physical, economic, and mental injuries; punitive damages to punish defendants for engaging in human rights abuses and to deter similar behavior in the future; and attorney's fees. Complaint ¶¶ 2, 468-559, 560 (*Al-Quraishi*); Complaint ¶¶ 2, 113-204, 205; *see also Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700 (E.D. Va. 2009); *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702 (D. Md. 2010).

The defendants filed motions to dismiss all of the claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), alleging that the claims were (1) nonjusticiable because they presented a political question, relying on *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991); (2) barred by derivative sovereign or absolute official immunity, as set forth in *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir. 1996); (3) preempted and displaced by the federal common law government contractor defense, as set forth in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), *cert. denied*, 131 S. Ct. 3055 (2011); and (4) barred by the law-of-war immunity recognized by the Supreme Court in *Dow v. Johnson*, 100 U.S. 158 (1880). With respect to the state law tort claims, both district courts below rejected all of these defenses and denied the motions to dismiss. And with respect to the ATS claims, the *Al Shimari* court dismissed, concluding that it lacked jurisdiction, 657 F. Supp. 2d at 725-728, while the *Al-Quraishi* court denied the motion to dismiss, 728 F. Supp. 2d at 741-60.

A panel of this court reversed the district courts' orders in two opinions released on the same day, concluding that the district courts should have dismissed the claims on the basis of the government contractor defense recognized in *Saleh*. *Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d 201 (4th Cir. 2011); *Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413 (4th Cir. 2011). On

the plaintiffs' motions, we granted a rehearing en banc and consolidated the appeals. At our invitation, the United States also participated as an amicus curiae, filing a brief and participating in oral argument on January 27, 2012. The majority now dismisses the appeals for a lack of final appealable orders under 28 U.S.C. § 1291 and thus allows the litigation to proceed in the district courts.

## II

Section 1291 of Title 28, authorizing "appeals from all final decisions of the district courts of the United States," codifies the "final judgment rule," representing "Congress' determination since the Judiciary Act of 1789 that as a general rule 'appellate review should be postponed . . . until after final judgment has been rendered by the trial court.'" *Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976) (quoting *Will v. United States*, 389 U.S. 90, 96 (1967)). Thus, the Supreme Court has emphasized "the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Mohawk Indus. v. Carpenter*, 130 S. Ct. 599, 605 (2009) (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)).

Falling within the category of appealable final decisions under § 1291 are certain collateral orders that are "other than final judgments" but "have a final and irreparable effect on the rights of the parties." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545 (1949). Under this "practical construction" given to the statutory language "final decisions," "[t]he authority of the Courts of Appeals to review all final decisions of the district courts" is construed to confer appellate jurisdiction over "'a narrow class of decisions that do not terminate the litigation' but are sufficiently important and collateral to the merits that they should 'nonetheless be treated as final.'" *Will v. Hallock*, 546 U.S. 345, 347 (2006) (quoting *Digital Equip.*, 511 U.S. at 867) (internal citation omitted). Thus, to be a final, appealable order, a collateral order must

satisfy three requirements: (1) it must "conclusively determine the disputed question"; (2) it must "resolve an important issue completely separate from the merits of the action"; and (3) it must be "effectively unreviewable on appeal from a final judgment." *Johnson v. Jones*, 515 U.S. 304, 310 (1995) (internal quotation marks omitted).

The Supreme Court has noted that the "collateral order doctrine" is of "modest scope," *Hallock*, 546 U.S. at 350, and should not be applied "to swallow the general rule that a party is entitled to a single appeal," *Mohawk Indus.*, 130 S. Ct. at 605 (quoting *Digital Equip.*, 511 U.S. at 868). But, equally important, the Court has noted that the doctrine is necessary and appropriate for cases involving a "particular value of high order" including "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, [or] respecting a State's dignitary interests." *Hallock*, 546 U.S. at 352-53. In this vein, the Supreme Court and our court have applied the collateral order doctrine to review interlocutory orders denying defendants' motions to dismiss on the basis of numerous asserted immunities. *See, e.g., Abney v. United States*, 431 U.S. 651 (1977) (double jeopardy claim); *Helstoski v. Meanor*, 442 U.S. 500 (1979) (Speech and Debate Clause immunity); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (absolute official immunity); *Mitchell v. Forsyth*, 472 U.S. 511 (1985) (qualified immunity); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993) (Eleventh Amendment immunity); *Osborn v. Haley*, 549 U.S. 225 (2007) (Westfall Act immunity certification); *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009) (foreign sovereign immunity); *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193 (2007) (same); *Roberson v. Mullins*, 29 F.3d 132 (4th Cir. 1994) (absolute legislative immunity); *Mangold*, 77 F.3d 1442 (derivative immunity for a contractor).

Some or all of the defendants' claims of immunity in these cases are thus entitled to our review under the collateral order doctrine, and I address them seriatim.

### A.  Derivative Absolute Immunity

Immunity generally protects government officials from liability based on their office, their function, and the public interest. And when litigation is commenced to enforce *liability* against them, the officials are, if the public interest is sufficiently strong, also protected from defending the *suit* itself, even when the official is accused of misconduct. *See Nixon*, 457 U.S. at 752 (noting that immunity is afforded when it is in the public interest to provide an official "the maximum ability to deal fearlessly and impartially with duties of his office" (internal quotation marks omitted). Of course, each particular immunity is defined by the official claiming it, by his function, and by the particular public interest sought to be protected.

In this case, the defendants claim, among other immunities, derivative absolute immunity based on their role in carrying out the U.S. military's mission in the Iraq war zone under the ultimate direction and control of the military. As alleged in the complaints, the defendants were retained by the U.S. military to perform interrogation and translation services in the interrogation of military detainees in military prisons throughout the Iraqi war zone. Complaint ¶¶ 8, 435, 436, 442 (*Al-Quraishi*); Complaint ¶¶ 1, 10, 64 (*Al Shimari*). Indeed, the complaints assert that the defendants were functioning on behalf of the U.S. military and in conspiracy with military personnel "during a period of armed conflict, in connection with hostilities." Complaint ¶ 497 (*Al-Quraishi*); Complaint ¶ 142 (*Al Shimari*).

Regardless of whether these facts are ultimately proved, they were alleged by the plaintiffs in their complaints and admitted by the defendants in asserting immunity. And on the basis of these facts, both district courts below conclusively determined that the defendants were not entitled to the derivative immunity recognized in *Mangold*. In one decision, the district court stated that it "*reject[ed]* both arguments" made

by the defendant that it was immune under the "doctrine of derivative absolute official immunity" because it could not "determine the scope of Defendants' government contract, the amount of discretion it afforded Defendants in dealing with detainees, or the costs and benefits of recognizing immunity in this case without examining a complete record after discovery has taken place." *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 714 (E.D. Va. 2009) (emphasis added).

In the other decision below, the district court concluded that "*relying on the information in the Complaint*, it is *clearly too early* to dismiss Defendants on the basis of derivative sovereign immunity," explaining that "the contract between [the contractor] and the military is not before the Court at this time," making it impossible to "determin[e] both the scope of the contract and whether that scope was exceeded." *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 735 (D. Md. 2010).

Thus, both of these opinions take the facts as alleged by the plaintiffs in their complaints as true and conclude that the defendants were not entitled to derivative immunity.

As both the Supreme Court's precedents and our precedents clearly establish, when a district court refuses to grant an immunity from suit on the basis of the facts alleged in a complaint, the refusals are immediately appealable. Whether they are rightly or wrongly decided, we have jurisdiction to review such rulings to protect the defendants from the costs and distraction of litigation, which undermine the public interest in protecting the governmental function of war zone interrogations. The district courts' refusals to recognize this immunity can undoubtedly be *immediately* appealed under the collateral order doctrine. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Behrens v. Pelletier*, 516 U.S. 299, 303 (1996); *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc); *McVey v. Stacy*, 157 F.3d 271, 275 (4th Cir. 1998).

The majority does not take issue with the defendants' claim of immunity under the doctrine of derivative absolute immu-

nity, nor does it take issue with the principle that this immunity protects defendants from suit. *Ante*, at 35 ("*Mangold* immunity confers upon those within its aegis the right not to stand trial"). Rather, the majority defers any ruling on the immunity because the "record [was not] sufficiently developed through discovery proceedings to accurately assess any claim, including one of immunity." As the majority explains:

> The Maryland and Virginia district courts each perceived that the validity of such invocations [of immunity] depended in significant part on whether the contractor involved was acting within the scope of its agreement with the United States. One could hardly begin to answer that question without resort to any and all contracts between the appellants and the government pertinent to the claims, defenses, and related matters below.

*Ante*, at 29-30. Thus, the majority concludes that because the district courts deferred ruling on derivative immunity until the record was more developed, their decisions lack finality and fail the requirements of *Hallock*, 546 U.S. at 349-50, that collateral orders be conclusively determined.

The majority fails to recognize, however, that its conclusions are contrary to well-established Supreme Court and Fourth Circuit precedents and that the district courts' decisions in refusing to grant immunity on motions to dismiss based on Rules 12(b)(1) and 12(b)(6) are appealable final determinations under the collateral order doctrine.

In *Behrens*, 516 U.S. at 303, the district court had entered an order denying, without prejudice, a motion to dismiss based on a defense of qualified immunity, giving as its reason the fact that *it was premature because of the lack of discovery*. Both the Ninth Circuit in the first appeal taken and, eventually the Supreme Court, recognized that the district court's order deferring consideration pending discovery was a final deter-

mination of the immunity defense, subject to immediate appeal under the collateral order doctrine. *See Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 871 (9th Cir. 1992); *Behrens*, 516 U.S. at 308 ("Whether or not a later summary judgment motion [on the basis of immunity] is granted, *denial of a motion to dismiss is conclusive as to this right*" (emphasis added)). As the *Behrens* Court noted, at the motion-to-dismiss stage of a proceeding, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized." *Behrens*, 516 U.S. at 309 (emphasis added); *see also Mitchell v. Forsyth*, 472 U.S. 511, 529 n.9 (1985) ("[W]e emphasize at this point that the appealable issue is a purely legal one: *whether the facts alleged . . .* support a claim of violation of clearly established law" (emphasis added)).

More recently, in *Iqbal*, the Supreme Court reaffirmed *Behrens* and its principle that "a district court's order rejecting qualified immunity *at the motion-to-dismiss stage* of a proceeding is a 'final decision' within the meaning of § 1291." *Iqbal*, 556 U.S. at 672 (emphasis added).

Until this decision by the majority, we have applied the reasoning of *Mitchell* and *Behrens* faithfully and consistently, holding that the denial of *a motion to dismiss* based on an immunity that is properly characterized as an immunity from suit, even if on the basis that more discovery is necessary, is a collateral order over which we have jurisdiction under 28 U.S.C. § 1291. In *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc), we declared that we had jurisdiction to review a district court's denial of a motion to dismiss based on qualified immunity even though the district court had refused to rule on immunity at that stage because an answer had not yet been filed. Without qualification, we stated that "[w]hen a district court denies a motion to dismiss that is based on qualified immunity . . . the action is a final order reviewable by this court." *Id.*; *see also Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc) (finding jurisdiction to review an immunity claim "accepting the facts as the dis-

trict court viewed them," even though factual issues remained).

Again, in *McVey*, 157 F.3d at 275, we applied *Behrens* and concluded that we had jurisdiction over the denial of qualified immunity even though we "recognized that the district court's order essentially deferring a ruling on qualified immunity would appear, at first blush, to amount to a routine procedural order that is generally not appealable." As we reasoned:

> [I]n rejecting the immunity defense "at this early stage," the district court necessarily subjected the commissioners to the burden of further trial procedures and discovery, perhaps unnecessarily. [The district court's] order implicitly ruled against the commissioners on . . . legal questions . . . . These questions do not raise factual questions concerning the defendants' involvement, which would not be appealable . . . . On the contrary, *they are answered with the facts of the complaint assumed to be true as a matter of law*. They are therefore the very questions that *Mitchell* held were appealable.

*Id.* at 276 (emphasis added) (internal citations omitted).

Although the majority acknowledges these precedents, it attempts to distinguish them by noting that *Behrens* "confers jurisdiction of these appeals only if the record at the dismissal stage can be construed to present a pure issue of law." *Ante*, at 32. It finds that in these cases "those facts that may have been tentatively designated as outcome-determinative are yet subject to genuine dispute, that is, a reasonable factfinder could conclude in favor of either the plaintiffs or the defendants," and thus we lack jurisdiction because the "courts' immunity rulings below turn[ed] on genuineness." *Ante*, at 34-35. The majority's new "genuineness" addition to the collateral order doctrine, however, finds no support in the Supreme Court's discussion of collateral order immunity

appeals. To the extent the majority is simply stating the well-established rule that a collateral order immunity appeal must present a purely legal question, there can be no debate that the appeals in the cases before us present just such a question. *Mitchell*, *Behrens*, and *Iqbal* establish without question that these appeals present a purely legal question because we are asked to decide whether the defendants are entitled to derivative immunity *on the basis of the facts as alleged by the plaintiffs* in their complaints. The possibility that a factfinder might construe these facts in favor of the *defendants* at a later time does not, by some heretofore unknown legal device, create a factual dispute that deprives us of jurisdiction at the motion-to-dismiss stage. As a matter of logical necessity, there can be no genuine issue of material fact when we are reviewing only the facts as alleged by the plaintiff in the complaint. The majority simply ignores *Mitchell*'s statement that "the appealable issue is a *purely legal one: whether the facts alleged*" support a claim of immunity. 472 U.S. at 528 n.9.

The majority's claim that it could only discern a "pure issue of law" if it "were of the opinion, as the dissenters evidently are, that persons similarly situated to the appellants are inevitably and invariably immune from suit," *ante*, at 32-33, demonstrates the fundamental error of its approach. If the majority believes that the defendants cannot establish their claims to immunity from suit, accepting as true the facts in the complaint, then *it should deny the derivative immunity defense on the merits* and allow the district courts to proceed and develop a fuller factual record. Indeed, *Behrens* considers this very possibility, allowing the defendants to pursue a second immunity appeal after the denial of summary judgment even if they have already unsuccessfully appealed the district court's denial of their motion to dismiss. 516 U.S. at 305-08. Surprisingly, the majority *admits* that we have jurisdiction to review whether "facts that are undisputed or viewed in a particular light are material to the immunity calculus," *ante*, at 32, but then mysteriously concludes that we cannot determine whether these same facts *establish* immunity. Thus, under the

majority's novel approach to the collateral order doctrine, we have jurisdiction to review whether undisputed facts are "material" to a question of immunity, but we have no jurisdiction to review the immunity determination itself. Such a rule finds absolutely no legal support.

Whether it is to avoid the difficulty presented by the political question doctrine or to evade the other difficult questions the merits of these important cases present, the majority chooses to decimate existing collateral order jurisprudence by finding a "genuine" dispute of material fact in a case in which we are asked to review district court decisions denying derivative immunity based only on *undisputed* facts, those alleged in the complaint. *See McVey*, 157 F.3d at 276 ("These questions do not raise factual questions concerning the defendants' involvement . . . . On the contrary, they are answered with the facts of the complaint assumed to be true as a matter of law. They are therefore the very questions that *Mitchell* held were appealable"). The majority's approach is manifestly contrary to the Supreme Court's collateral order immunity jurisprudence.

Rather than following these binding precedents of the Supreme Court and our court, the majority chooses to rely on a distinguishable Fifth Circuit decision that refused to consider a claim of immunity because it was neither "substantial" nor "colorable." *See Martin v. Halliburton*, 618 F.3d 476, 484 (5th Cir. 2010). The *Martin* court, however, did not decide the issue before us today. In that case, regulations governing the contractor explicitly stated that "[c]ontractors will not be used to perform inherently governmental functions" and "expressly preclude[d] Defendant [contractors] from engaging in discretionary conduct," which was a prerequisite for finding derivative immunity. *See id.* at 484. Thus, the language of the regulations themselves made the defendants' contentions that they had engaged in the performance of governmental functions frivolous and unsubstantial.

Under our decision in *Mangold* and its progeny, there can be no serious argument that, based on the complaint, the defendants in these cases failed to present a substantial basis for the immunity. *See Mangold*, 77 F.3d at 1442 (holding that government *functions* performed by private contractors are protected by immunity both for the government and the contractor); *see also Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 175 (2d Cir. 2006) (government contractor absolutely immune from tort liability for performing contracted-for governmental function, citing *Mangold*); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71-73 (2d Cir. 1998) (same); *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1005 (8th Cir. 1998) (common law official immunity barred tort suit against Medicare insurer). This immunity protects contractors from suit where such an immunity is necessary to protect a discretionary government function and the benefits of immunity outweigh its costs. For example, in *Mangold*, we held that "the interest in efficient government" justified granting a private contractor immunity for statements made during an official investigation of government procurement practices. 77 F.3d at 1447-48.

And recently, the Supreme Court has reaffirmed the need to protect those who perform government *functions* with immunity regardless of whether they are public employees, such as military officers, or private individuals retained to perform the same function. *See Filarsky v. Delia*, 132 S. Ct. 1662, 1663 (2012) ("[T]he common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities").

But the majority never disputes this, nor even discusses why the allegations in the complaint present only a frivolous and unsubstantial claim to derivative immunity. Instead, it frames the dispositive question as one of finality. In so doing, the majority ignores the fundamental and well-established principle that a district court's denial of a motion to dismiss

based on an immunity from suit is a final, immediately appealable collateral order. Whether discovery could help make the issue more clear or whether the district courts wanted a fuller record before ruling on the merits of immunity is irrelevant. The defendants claim entitlement to be protected *from the litigation process*, and the court's refusal to grant the immunity denied them that protection and was therefore an appealable decision under *Mitchell*, *Behrens*, *Iqbal*, *Jenkins*, *Winfield*, and *McVey*. It is most regrettable that the majority so readily tramples on these precedents, which clearly provide us with appellate jurisdiction *at this stage of the proceedings* to consider the substantial claims of immunity asserted by the defendants on the basis of the facts alleged in the complaint.[1]

---

[1]The majority also inexplicably dismisses L-3's arguments relating to the Alien Tort Statute in a footnote, claiming that they deserve no different analysis than do the state law claims. *Ante*, at 35-36 n.19. But in so concluding, the majority fails to recognize that plaintiffs' Alien Tort Statute claims, of jurisdictional necessity, include allegations that the defendants' allegedly abusive conduct was the conduct *of the United States* and therefore any claim of derivative immunity would have to be substantial as a matter of law.

Although the district court in *Al Shimari* dismissed the plaintiffs' claims under the ATS, the district court in *Al-Quraishi* failed to dismiss the ATS claims against L-3 and its employee. L-3 contends on appeal that the denial of its motion to dismiss the ATS claims on account of derivative immunity, among other defenses, was an error. L-3's claim to derivative absolute immunity in the ATS context is thus undeniably "substantial." In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), plaintiffs alleged that defendants had violated the law of nations by engaging in "summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities," as part of a conspiracy arising out of the U.S. government's actions in Nicaragua. *Id.* at 205. In a unanimous opinion authored by then-Judge Scalia and joined by then-Judge Ginsburg, the D.C. Circuit found that "[i]t would make a mockery of the doctrine of sovereign immunity" to permit the ATS claims to proceed based on "actions that are, *concededly and as a jurisdictional necessity*, official actions of the United States." *Id.* at 207. Like the allegations in *Sanchez-Espinoza*, plaintiffs must, to maintain their ATS claims, allege that the actions of the defendants were actions of the United States as a jurisdictional necessity. *See Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir.

### B.     Combatant Activities Immunity under *Saleh*

The defendants also asserted an immunity from suit based on the combatant activities exception to the Federal Tort Claims Act and the D.C. Circuit's application of that immunity in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), *cert. denied*, 131 S. Ct. 3055 (2011). This immunity, applied to military contractors, is based on the United States' sovereign immunity for claims arising out of combatant activities of the military during time of war. *See* 28 U.S.C. § 2680(j).

Again, in response to the allegations of the plaintiffs' complaints, the defendants claimed that their immunity is based on the United States' interests, as embodied in the combatant activities exception and as applied in *Saleh*. Under this immunity, when claims arise out of federal combatant activities, the federal interests *preempt* the application of state tort law to its contractors and then *replace* state tort law with federal common law, which recognizes an immunity for claims against

---

1995) ("[T]orture and summary execution . . . are proscribed by international law only when committed by state officials or under color of law"). To establish jurisdiction for their ATS claims alleging "war crimes," the plaintiffs must at the very least allege that the defendants in this case were "parties" to the hostilities in Iraq, *id.*, and may have to demonstrate state action as well if the court considered war crimes to violate international norms only to the extent they were committed by combatants or state actors, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 731-38 (2004); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-95 (D.C. Cir. 1994) (Edwards, J., concurring).

Thus, the defendants' claims to derivative immunity as to the ATS claims in *Al-Quraishi* are obviously substantial because plaintiffs must allege as a jurisdictional necessity either state action or that the defendants were "parties" to the armed conflict in Iraq. Both allegations add further weight to the contention that the defendants were performing a state function and thus entitled to the same immunities afforded public officials performing that function. *See Filarsky*, 132 S. Ct. at 1663. I therefore fail to understand how these defenses can be dismissed as so insubstantial and frivolous that we lack jurisdiction even to entertain them.

contractors arising out of combatant activities. The United States' interest in its contractors' performance in the course of combatant activities grows out of the uniquely federal interest in the unencumbered operation of military personnel and in the "*elimination of tort from the battlefield*, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in *potential* subjection to civil suit." *Saleh*, 580 F.3d at 7 (emphasis added). "[T]he policies of the combatant activities exception are equally implicated whether the alleged tort-feasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military's control." *Id.* The policy to protect these interests can only be furthered and preserved if the defense protects against *potential lawsuits* brought under any civilian tort law, not simply against ultimate liability.

The district courts denied the claimed immunities. The court in *Al-Quraishi* refused to recognize the unique federal interests embodied in the combatant activities exception. *Al-Quraishi*, 728 F. Supp. 2d at 738-39. And the court in *Al Shimari* simply rejected the defense as to these defendants in a conclusory manner. *Al Shimari*, 657 F. Supp. 2d at 725. Both courts thus held that the defendants were entitled to neither the displacement of state tort law nor the application of federal common law immunizing them from suit.

The majority now refuses also to review these district court orders, thus denying the defendants the combatant activities immunity. It does so mainly by relying on an unexplored labeling problem. It states conclusorily, "*Boyle* preemption (and, thus, *Saleh* preemption) is, *ipso facto*, not immunity." *Ante*, at 25. And again, repeating its labeling reliance, it declares, "*Saleh* preemption falls squarely on the side of being a defense to liability and not an immunity from suit." *Ante*, at 24. The only analysis the majority accords the issue is an observation that immunity "derives from an explicit statutory or constructive guarantee that trial will not occur" (internal

quotation marks omitted), and that *Boyle*, "from which *Saleh* preemption is derived, [did not rely] on any such explicit guarantee." *Ante*, at 24. The majority's opinion, however, neither considers what *Saleh* actually held in order to prove its assertion, nor analyzes the text of the combatant activities exception and the unique federal interests it embodies. Moreover, it assumes, without analysis, that *Boyle* and *Saleh* are identical for purposes of its collateral order analysis.

Surely our jurisdiction to consider the district courts' orders cannot depend wholly on labels such as "preemption" and "immunity." Nonetheless, if a vote on labels were critical, the majority would have little support, as virtually every court that has considered the government contractor defense set forth in *Boyle* takes it as a two-step defense leading to immunity. Under the first step, the court preempts state tort law, and under the second, it recognizes the federal common law providing immunity to such contractors. *See In re Katrina Canal Breaches*, 620 F.3d 455, 457 (5th Cir. 2010) (characterizing the defense recognized in *Boyle* as "government contractor immunity"); *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 196 (2d Cir. 2008) ("In *Boyle*, the Court refined the requirements for a *type of derivative immunity* for government military contractors" (emphasis added)); *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 44 n.6 (1st Cir. 1999) ("[T]he [Boyle] Court used the terminology of 'displacement of state law' and 'preemption' in determining whether federal law should provide government contractors with *immunity* from certain state-law product liability actions" (emphasis added)); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998) ("The Supreme Court set out the test for *immunity* under the government contractor defense in *Boyle*" (emphasis added)); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996) ("The government contractor defense is derived from the *government's immunity* from suit when the performance of a discretionary function is at issue" (emphasis added)); *Mangold*, 77 F.3d at 1448 ("Extending *immunity* to private contractors to protect an

important government interest is not novel. *See, e.g., Boyle*[ ]" (emphasis added)); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995) ("The Boyle Court held that, under certain circumstances, government contractors are *immune* from state tort liability" (emphasis added)); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir. 1993) (noting that the rationale that "underlies the modern government contractor defense" is that "[a] private contractor . . . should, in some circumstances, share *the sovereign immunity* of the United States" (emphasis added)); *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989) ("In the military context, this [government contractor] *immunity* serves the further important purpose of shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them" (emphasis added)).

Rather than counting labeling votes, however, we must, in determining our appellate jurisdiction over the defendants' claim of *Saleh* immunity, inquire whether the assertion of *Saleh* immunity falls within the category of collateral orders that the Supreme Court has held appealable under the collateral order doctrine.

We begin by looking to the methodology in *Boyle*, which was employed by *Saleh* to identify the unique federal interests in these cases. In *Boyle*, the Supreme Court referred to the "displacement" of state law with federal common law, 487 U.S. at 505, 507, 512 (emphasis added), and specifically held that "a few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and *replaced*, where necessary, by federal law of a *content* prescribed (absent explicit statutory directive) by the *courts*—so called 'federal common law.'" *Id.* at 504 (emphasis added) (internal citation omitted). Thus, it is the *content* of this federal common law that defines the rights and defenses of the government contractor defendant, not the preemption leading to application of the federal common law.

In *Boyle*, the father of a deceased helicopter pilot sued the helicopter's manufacturer, a private government contractor, under Virginia tort law, alleging that the helicopter's escape hatch had been defectively designed because it opened out rather than in. *Id.* at 502-03. While the pilot survived the impact of the helicopter's crash off the coast of Virginia, he was unable to escape because the water pressure prevented the escape hatch from opening. The Court concluded that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and *must be displaced*." *Id.* at 512 (emphasis added).

The *Boyle* Court reached its conclusion through a two-step process. First, it recognized that the subject matter of the suit implicated "uniquely federal interests," because it involved the "performance of federal procurement contracts," which "border[ed] upon two areas that [the Court] ha[d] found to involve such 'uniquely federal interests'": (1) the rights and obligations of the United States under its contracts, and (2) the "civil liability of federal officials for actions taken in the course of their duty." *Id.* at 504-06. In the second step, after recognizing these interests, the Court asked whether a "significant conflict exist[ed] between an identifiable federal policy or interest and the operation of state law," and whether "the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (internal quotation marks and citation omitted). The Court explained that "[t]he conflict with federal policy need not be as sharp to justify preemption" when a suit involves an area of "unique federal concern," but nonetheless "conflict there must be." *Id.* at 507-08. The Court then found this conflict in the discretionary function exception to the Federal Tort Claims Act ("FTCA"), noting that it "demonstrates the potential for, and suggests the outlines of, 'significant conflict' between federal interests and state law in the context of Government procurement." *Id.* at 511.

The *Boyle* case thus works the displacement of state law, through preemption, with *federal common law* and then

describes the *content* of the federal common law government contractor defense, looking for that purpose to the discretionary function exception in the FTCA.

This case, however, does not involve the government contractor defense recognized in *Boyle*, but rather a defense based on the combatant activities exception, a common law immunity recognized in the FTCA. *See* 28 U.S.C. § 2680(j) (retaining sovereign immunity for claims "arising out of the combatant activities of the military or naval forces, or the Coast Guard during time of war"); *see also Filarsky*, 132 S. Ct. at 1665 ("[W]e 'proceed[ ] on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so'" (first alteration in original) (quoting *Pulliam v. Allen*, 466 U.S. 522, 529 (1984))). The defendants in this case asked the district courts to apply the *methodology* of *Boyle*, as the court did in *Saleh*, in order to recognize the federal common law defense based on the *combatant activities exception*, which is animated by different interests than were at issue in *Boyle*. *See Saleh*, 580 F.3d at 6 ("The *crucial* point is that the [*Boyle*] court looked to the FTCA exceptions to the waiver of sovereign immunity in order to determine that the conflict was significant and to measure the boundaries of the conflict" (emphasis added)).[2]

*Saleh* indeed did apply the *Boyle* methodology to circumstances *identical to those before us*. Thus the *Saleh* court con-

---

[2]The majority's assertion that we are "repackaging for the sake of convenience the preemption defense derived from *Boyle* as 'combatant activities immunity,'" *ante*, at 26, ignores the fact that *Boyle* and *Saleh*, though they both apply preemption, then proceed to apply different principles of federal common law to the issue at hand. Thus, not only are we *not* applying the common law applied in *Boyle*, we are also not repackaging anything from *Boyle*. Rather, we are analyzing the content of the federal common law that the *Boyle* methodology instructs us to apply. *Saleh* analyzed the content of this law as well, and the majority simply ignores that there is any such content in its singular focus on the "preemption" label.

cluded that Congress intended the combatant activities exception to "eliminat[e] . . . tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in *potential* subjection to civil suit." *Saleh*, 590 F.3d at 7 (emphasis added). The D.C. Circuit in *Saleh* explained:

> In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the State or foreign sovereign. Rather, it is the imposition *per se* of the state or foreign tort law that conflicts with the FTCA's policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, "battle-field preemption": the federal government occupies the field when it comes to warfare, and its interest in combat is always "precisely contrary" to the imposition of a non-federal tort duty.

*Saleh*, 580 F.3d at 7. After displacing state tort law in favor of the unique federal interests at stake, the *Saleh* court dismissed the complaints based on sovereign immunity.

Thus, to reject the defendants' claim of sovereign immunity under *Saleh* amounts to subjecting government contractors engaged in the war effort of the military to suits, thereby interfering with the very combatant activities intended to be protected from suit by federal statutory and common law. The government's unique interest can only be protected and preserved if the *Saleh* defense to a potential suit is preserved by our review at the outset of litigation. This is because the *Saleh* immunity serves the interests of freeing officers engaged in combatant activities from "the doubts and uncertainty inherent

in *potential* subjection to civil suit." *Saleh* 580 F.3d at 7 (emphasis added).

Although the legislative history of the combatant activities exception is "singularly barren," courts have long recognized that the exception serves to exempt activities that "by their very nature should be free from the hindrance of a *possible* damage suit." *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948) (emphasis added). In recognizing the interests that made qualified immunity a protection against standing trial, the Supreme Court has similarly emphasized that "the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Mitchell*, 472 U.S. at 525 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). These "consequences" were "not limited to liability for money damages" but also included "'the general costs of subjecting officials to the risks of trial-distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'" *Id.* at 526 (quoting *Harlow*, 457 U.S. at 816).

Moreover, in *Filarsky*, the Supreme Court relied on the same public interest in holding that common law immunity protects not only government employees but also private contractors when performing the government's work:

> The public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation.

*Filarsky*, 132 S. Ct. at 1666 (citation omitted).

The same concerns recognized in *Mitchell* and *Filarsky* animate the combatant activities exception here, ensuring that entities engaged in actions arising out of combatant activities do not suffer "distraction," are not slowed by "inhibition," and are willing to serve our country. As *Saleh* noted, "the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty." 580 F.3d at 7; *see also Koohi v. United States*, 976 F.2d 1328, 1337 (9th Cir. 1992) ("[O]ne purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action").

In short, the unique federal interest embodied in the combatant activities exception to the FTCA is an interest in freeing military actors from the distraction, inhibition, and fear that the imposition of state tort law by means of a *potential* civil suit entails. It makes no difference whether the military actors are low-level soldiers, commanders, or military contractors. The Supreme Court has made clear that immunity attaches to the *function* being performed, and private actors who are hired by the government to perform public functions are entitled to the same immunities to which public officials performing those duties would be entitled. *See Filarsky*, 132 S. Ct. at 1661-66. The unanimous Supreme Court in *Filarsky* emphasized that imposing liability on private individuals performing public functions will result in "unwarranted timidity" on the part of "those engaged in the public's business," calling this concern "the most important special government immunity-producing concern." *Id.* at 1665 (internal quotation marks omitted). It recognized the need to "afford[ ] immunity not only to public employees but also to others acting on behalf of the government" because "often when there is a particular need for specialized knowledge or expertise . . . the government must look outside its permanent work force to secure the services of private individuals." *Id.* at 1665-66.

This case presents just such an example. The military had a need for specialized language and interrogation skills and hired private individuals to work with the military in performing its public function. Because potential suit and liability would result in "unwarranted timidity" on the part of these government contractors, they must share the common law immunity enjoyed by the military and retained by the FTCA combatant activities exception. These interests underlying this immunity are only protected if the immunity is not only an immunity from liability, but also an immunity from suit.

Thus, the denial of a combatant activities defense will be effectively unreviewable at final judgment because the defendants will no longer be able to vindicate their right to avoid the burdens and distractions of trial. Military contractors will have to undertake future actions "arising out of combatant activities" with the understanding that they are presumptively subject to civil tort law and must abide by state law duties of care in the middle of a foreign war zone. The result will be exactly what the Supreme Court cautioned against in *Filarsky*: "those working alongside [government employees] could be left holding the bag — facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." 132 S. Ct. at 1666. The governmental interests in uninhibited military action and in the attraction of talented candidates, both public and private, animate the combatant activities exception, and these interests are far broader than the limited interests recognized by the majority, which focuses only on "sensitive military issues." *Ante*, at 27. Such a narrow mischaracterization of the federal interest ignores the broad language of the exception (protecting actions "*arising out of* combatant activities") and finds no support in federal common law.

At bottom, it is readily apparent that the district courts' orders denying *Saleh* immunity fall comfortably within the collateral order doctrine. As the Supreme Court has said in summarizing its collateral order precedents:

In each case, some particular value of a high order was marshaled in support of the interest in avoiding trial: *honoring the separation of powers, preserving the efficiency of government and the initiative of its officials*, respecting a State's dignitary interest, and mitigating the government's advantage over the individual. That is, it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is "effectively" unreviewable if review is to be left until later.

*Will v. Hallock*, 546 U.S. 345, 352-53 (2006) (emphasis added). So it is in these cases.

## C.   Law-of-War Immunity

Finally, CACI and L-3 claimed protection from suit and from the application of Iraqi law under law-of-war immunity, as recognized in the Supreme Court's decision in *Dow v. Johnson*, 100 U.S. 158 (1879), because they were part of the occupying force in the middle of an ongoing war.[3]

The plaintiffs agree that the district courts conclusively decided that defendants were not entitled to law-of-war immunity and that the issue is collateral to the merits. They contend, however, that this immunity is not an immunity from

---

[3]In *Al-Quraishi*, the district court determined that Iraqi law would apply to the action under Maryland's adherence to the *lex loci delicti* rule in analyzing choice of law in tort actions. 728 F. Supp. 2d at 761-62. In *Al Shimari*, the district court noted that it would "present the parties with the opportunity to address the choice of law issue at a later date," and did not determine what law would apply. 657 F. Supp. 2d at 725 n.7. Virginia law, however, also applies the *lex loci delicti* rule and, thus, Iraqi law would appear to apply in that action as well. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F. 3d 270, 275 (4th Cir. 2007) (per curiam). As Judge Wilkinson notes, however, the plaintiffs in *Al Shimari* contend that Virginia law should apply.

suit but a doctrine of jurisdiction, depriving courts in an occupied territory of jurisdiction over the occupying forces.

In its amicus brief, the United States noted, without explanation, that "*Dow* and the policies it reflects may well inform the ultimate disposition of these claims," but the United States was "not prepared . . . to conclude that the contractor defendants have demonstrated a right to immediate review of their contentions based on *Dow* alone."

The majority again resorts to labels to resolve this immunity issue, noting that *Dow* does not use the word "immunity." The fact that *Dow* does not use the specific term "immunity," however, has little relevance to the question of whether a ruling denying application of its holding is immediately appealable. *Dow* characterized the defense at issue as an "*exemption from . . . civil proceedings*,"[4] 100 U.S. at 165 (emphasis added), which, as was customary to find at the time, led to a lack of "jurisdiction" of the court over the defendant, *id.* at 170. In *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), which was relied on by *Dow*, the Court similarly used the language of "jurisdiction," and this phrase was later interpreted by the Supreme Court to stand for what we call, in today's parlance, foreign sovereign immunity. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). Further, subsequent cases, including Supreme Court decisions, recognize that the *Dow* protection is a type of

---

[4]Compare this language with the Supreme Court's more recent characterization that qualified immunity "*shields* government agents from liability for civil damages," *Behrens*, 516 U.S. at 305 (internal quotation marks and alterations omitted) (emphasis added), or that it serves as a "protection to *shield* [defendants] from undue interference with their duties and from potentially disabling threats of liability," *Harlow v. Fitzgerald*, 457 U.S. 801, 806 (1982) (emphasis added), and again that government officials are "*shielded* from liability for civil damages," *id.* at 818 (emphasis added). *See also Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (noting that qualified immunity "*shield[s]*" government officials "from civil damages liability").

immunity. *See Underhill v. Hernandez*, 168 U.S. 250, 252-53
(1897); *Moyer v. Peabody*, 212 U.S. 78, 85-86 (1909); *"Act
of State" Immunity*, 57 Yale L.J. 108, 112 (1947).

Rather than fuss with a label, however, we must determine
the nature of the defense recognized in *Dow* so as to be able
to determine whether its rejection is immediately appealable.

The majority finds it "curious to imagine the nineteenth
century [Supreme] Court regarding its decisions in the Civil
War cases as having durable precedential effect," citing no
authority to reach that conclusion, and implies they may not
"possess continued relevance beyond their immediate con-
text." *Ante*, at 23-24. By contrast, at oral argument, the United
States postulated that the "principles of *Dow* may have further
life in other doctrines," and specifically argued that these
principles may be "given effect" by courts in their recognition
of the federal common law defense identified in *Saleh* based
on the combatant activities exception. *Dow* and other cases of
its era were decided as a matter of federal and international
common law at a time when the Supreme Court recognized
the validity of such common law. *See Ford v. Surget*, 97 U.S.
594, 613 (1878) (finding a Mississippi *civilian* immune from
civil suit for destroying another citizen's cotton in support of
the occupying Confederate army based on the "common laws
of war—those maxims of humanity, moderation, and justice"
and the "law of nations").

Although the invocation of federal common law was
restricted severely with the Supreme Court's decision in *Erie
Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the Court's
decision in *Boyle* nonetheless explicitly instructs courts to dis-
place state tort law with federal common law when the impo-
sition of state tort law would conflict with uniquely federal
interests. The immunity recognized in *Dow* falls within the
same body of federal common law that displaces state law
under the methodology employed by *Boyle*. And "common-
law principles of . . . immunity were incorporated into our

judicial system and . . . should not be abrogated absent clear legislative intent to do so." *Filarsky*, 132 S. Ct. at 1665 (internal quotation marks omitted). For this reason, the immunity claimed by the defendants under *Dow* and the immunity claimed under the common law defense based on the combatant activities exception are simply two variations of the same principle; they are both a common law immunity from suit. And *Boyle* provides the methodology for preempting state law and applying the federal common law immunity, as pointed out in *Saleh*.

The majority relies heavily on the Supreme Court's statement that an immunity from suit must typically be derived from "an *explicit* statutory or constitutional guarantee that trial will not occur." Ante, at 24. Thus, the majority would conclude that *Saleh* preemption cannot be an immunity from suit, because there is "no contention that the Supreme Court in *Boyle*[ ], from which *Saleh* preemption is derived, relied on any such explicit guarantee embodied in statute or in the Constitution." *Ante*, at 24-25. Retreating almost immediately from this categorical statement, however, the majority then admits in a footnote that the Supreme Court has recognized an implicit immunity from suit when such immunity has a "'good pedigree in public law,' which more than makes up for its implicitness." *Ante*, at 24 n.9 (quoting *Digital Equip.*, 511 U.S. at 875). Yet, it continues to overlook the fact that the recognized need in *Dow* and other cases to free military operations from the duties and standards of state tort law represent the same kind of public law pedigree that led the Supreme Court to recognize qualified immunity, which is a common law defense and is concededly an immediately appealable issue. As the Supreme Court recently instructed, "We consult the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed with independence and without fear of conse-

quences." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1503 (2012) (internal quotations marks omitted).

Therefore, for the same reasons that the denial of the federal common law defense recognized in *Saleh* is immediately appealable, inasmuch as the exemption from suit will effectively be unreviewable on appeal, the denial of the law-of-war immunity is immediately appealable, either independently or as part and parcel of the *Saleh* defense. The similarity in language is striking. *Dow* asks, "[w]hat is the law which governs an army invading an enemy's country," and concludes that "[i]t is not the civil law of the invaded country; *it is not the civil law of the conquering country*: it is military law,—the law of war." 100 U.S. at 170. *Dow* continued to reason that "for the protection of the officers and soldiers of the army" the supremacy of the common law of war over the civil law "is as essential to the *efficiency* of the army as the supremacy of the civil law at home." *Id.* (emphasis added). Similarly, *Saleh* emphasizes the necessary "elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in *potential* subjection to civil suit." 580 F.3d at 7 (emphasis added). The freedom from "potential subjection" to civil suits and the ability of military personnel and contractors performing military functions to act efficiently, without the distraction and inhibition inherent in the potential imposition of state tort standards of duty onto an active, foreign war zone cannot be vindicated by reviewing the liability of officers or entities after a final judgment.

\* \* \*

The denial of any one of the three immunities claimed by CACI and L-3 is undoubtedly immediately appealable under the collateral order doctrine. Not only has the denial of such immunities, even on 12(b)(6) motions, traditionally been found to be immediately appealable, *see, e.g., Behrens*, 516 U.S. at 305-06, but the substance of each immunity claim is

a paradigm example of the type of collateral order that was held immediately appealable in *Cohen*. The immunities claimed protect the defendants from judicial intervention into battlefield operations, a protection which would necessarily be breached by subjecting battlefield operatives to suit. As noted above, these immunities can only be vindicated and protected by allowing interlocutory appellate review.

## III

Upon the necessary recognition of our appellate jurisdiction to consider the immunities on an interlocutory basis, we must, at once and as the next immediate step, consider our subject matter jurisdiction, as well as the subject matter jurisdiction of the district courts. "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself . . . ." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1988). Article III provides that the judicial power only extends to "Cases" or "Controversies," *U.S. Const.* art. III, § 2, and the "requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception,'" *id.* at 94-95 (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Even when faced with a collateral order immunity appeal, we are not relieved of the duty to ask first whether the district courts and then whether our court have Article III jurisdiction to hear these cases. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 121-22 (2d Cir. 2007) ("We conclude that review of [a removal] question is required pursuant to our independent obligation to satisfy ourselves of the jurisdiction of this court and the court below. . . . This obligation is not extinguished because an appeal [from the denial of sovereign immunity] is taken on an interlocutory basis and not from a final judgment"); *Kwai Fun Wong v. United States*,

373 F.3d 952, 960-61 (9th Cir. 2004) ("Resolution of subject matter jurisdiction is . . . necessary to ensure meaningful review of the district court's interlocutory rulings because if the appellate courts lack jurisdiction, they cannot review the merits of these properly appealed rulings" (internal quotation marks omitted) (alterations in original)); *Hospitality House, Inc. v. Gilbert*, 298 F.3d 424, 429 (5th Cir. 2002) ("[W]here, as in the instant case, we have interlocutory appellate jurisdiction to review a district court's denial of Eleventh Amendment immunity, we may first determine whether there is federal subject matter jurisdiction over the underlying case"); *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1201 (10th Cir. 2002) ("[J]urisdiction is a threshold question which an appellate court must resolve before addressing the merits of the matter before it. . . . [B]ecause we have appellate jurisdiction over the interlocutory appeal of defendants' assertion of Eleventh Amendment immunity, we also have appellate jurisdiction to determine whether the district court had subject matter jurisdiction over the Tribe's underlying claim against defendants in the first instance").[5]

In the cases presently before us, the plaintiffs have asked civilian courts to entertain state tort law causes of action based on conduct taken in connection with an active and ongoing war against another sovereign. To entertain the plaintiffs' claims would impose, for the first time, state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions textually committed by our Constitution to Congress, the President, and the Executive Branch. *See U.S. Const.* art. I, § 8, cls. 11-14

---

[5]Some of these courts have considered jurisdictional questions by exercising pendent appellate jurisdiction over the question, reasoning that determining subject matter jurisdiction is "necessary to ensure meaningful review" of the immunity question. *See Kwai Fun Wong*, 373 F.3d at 960-61; *Timpanogos Tribe*, 286 F.3d at 1201. Other courts have considered it because of their inherent power and obligation under *Steel Co.* to consider jurisdiction. *See Hospitality House*, 298 F.3d at 429-30. The result is the same under either approach.

(authorizing Congress to declare war, to raise armies and create a navy, and to make rules for the military); *id.* art. II, § 2 (providing that the President "shall be Commander-in-Chief of the army and navy of the United States, and of the militia of the several states, when called into the actual Service of the United States"). Because these cases implicate several "textually demonstrable constitutional commitment[s]" of authority to the "political department[s]," they have no place in federal courts and must be dismissed for lack of jurisdiction. *Baker v. Carr*, 369 U.S. 186, 216 (1962).

The plaintiffs in these cases were seized in a war zone by the military, having been suspected of hostile activity or of possessing useful intelligence. The function of detaining and interrogating such persons to obtain intelligence was undoubtedly critical to the success of military strategies and campaigns. The judgment of whom to interrogate, what to inquire about, and the techniques to use fell comfortably within the powers of the Commander-in-Chief and his subordinates in the chain of command. And CACI and L-3, as civilian contractors of the military, worked side by side with the military to carry out these military operations under the ultimate supervision and command of the military "during a period of armed conflict and in connection with hostilities." They were engaged by the military to pursue interrogations under the command and control of military personnel with respect to persons detained by the military. And, consistent with the close connection between the military and the military contractors, the complaints allege that the military and the civilian contractors conspired in their abuse of the military detainees.

For the reasons I gave in my panel concurrence in *Al Shimari*, 658 F.3d at 420-25 (Niemeyer, J., concurring), and the reasons given by Judge King in his majority opinion in *Taylor v. Kellogg Brown & Root Services*, 658 F.3d 402, 412 (4th Cir. 2011), I would conclude that the political question doctrine deprives both this court and the district courts of subject

matter jurisdiction to hear these cases. *See also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("It is . . . familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question"); *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense. . . . The strategy and tactics employed on the battlefield are clearly not subject to judicial review"); *Carmichael v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271, 1283 (11th Cir. 2009).

Accordingly, while we undoubtedly have appellate jurisdiction under *Cohen* to consider these appeals at this stage in the proceedings, we lack subject matter jurisdiction over these cases, as did the district courts. I would therefore dismiss these appeals for lack of subject matter jurisdiction and remand the cases to the district courts with orders that they likewise dismiss the cases for lack of subject matter jurisdiction.

Judge Wilkinson and Judge Shedd have indicated that they join this opinion.